# IN RE GROBAN ET AL.

No. 14.  Argued November 6, 1956.—Decided February 25, 1957.

*James F. Graham* and *Ernest B. Graham* argued the cause and filed a brief for appellants.

*Earl W. Allison* and *J. Ralston Werum* argued the cause and filed a brief for appellee.

MR. JUSTICE REED delivered the opinion of the Court.

The question presented by this appeal is whether appellants had a constitutional right under the Due Process Clause of the Fourteenth Amendment to the

assistance of their own counsel in giving testimony as witnesses at a proceeding conducted by the Ohio State Fire Marshal to investigate the causes of a fire.

After a fire occurred on the premises of a corporation owned and operated by appellants, the Fire Marshal started an investigation into the causes of the fire and subpoenaed appellants to appear as witnesses. The Fire Marshal refused to permit appellants' counsel to be present at the proceeding, relying on § 3737.13 of the Ohio Code, which provides that the "investigation may be private" and that he may "exclude from the place where [the] investigation is held all persons other than those required to be present . . . ." [1] Appellants declined to be sworn and to testify without the immediate presence of their counsel, who had accompanied them to the hearing. Their refusal was treated as a violation of § 3737.12, which provides that "No witness shall refuse to be sworn or refuse to testify . . . ." Section 3737.99 (A) provides that "Whoever violates section 3737.12 . . . may be summarily punished, by the officer concerned, by . . . commitment to the county jail until such person is willing to comply with the order of such officer." The Fire Marshal accordingly committed appellants to the county jail until such time as they should be willing to testify.[2] Appellants' application for a writ of habeas corpus was denied by the Ohio Court of Common Pleas, and this denial was affirmed on appeal by the Ohio Court of Appeals and by the Ohio Supreme Court.[3]

We postponed further consideration of the question of jurisdiction to the hearing on the merits. 351 U. S. 903. The Ohio Supreme Court construed § 3737.13 to

---

[1] Page's Ohio Rev. Code, 1954, § 3737.13.

[2] Appellants were released on bond and have never in fact been incarcerated.

[3] *In re Groban*, 99 Ohio App. 512, 135 N. E. 2d 477; 164 Ohio St. 26, 128 N. E. 2d 106.

authorize the Fire Marshal to exclude appellants' counsel from the proceeding. Since appellants' attack is on the constitutionality of that section, we have jurisdiction on appeal. 28 U. S. C. § 1257 (2).

We note at the outset that appellants explicitly disavow making any direct attack òn the Fire Marshal's power of summary punishment under § 3737.99 (A). They challenge not the validity of the procedure by which they were committed to jail, but the constitutional sufficiency of the grounds on which they were so committed. Their sole assertion is that the Fire Marshal's authority to exclude counsel under § 3737.13 was unconstitutional because they had a right, under the Due Process Clause, to the assistance of their counsel in giving their testimony.

It is clear that a defendant in a state criminal trial has an unqualified right, under the Due Process Clause, to be heard through his own counsel. *Chandler* v. *Fretag*, 348 U. S. 3. Prosecution of an individual differs widely from administrative investigation of incidents damaging to the economy or dangerous to the public. The proceeding before the Fire Marshal was not a criminal trial, nor was it an administrative proceeding that would in any way adjudicate appellants' responsibilities for the fire. It was a proceeding solely to elicit facts relating to the causes and circumstances of the fire. The Fire Marshal's duty was to "determine whether the fire was the result of carelessness or design," and to arrest any person against whom there was sufficient evidence on which to base a charge of arson.[4]

The fact that appellants were under a legal duty to speak and that their testimony might provide a basis for criminal charges against them does not mean that they had a constitutional right to the assistance of their counsel. Appellants here are witnesses from whom in-

---

[4] Page's Ohio Rev. Code, 1954, §§ 3737.08, 3737.10.

formation was sought as to the cause of the fire. A witness before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel,[5] nor can a witness before other investigatory bodies.[6] There is no more reason to allow the presence of counsel before a Fire Marshal trying in the public interest to determine the cause of a fire. Obviously in these situations evidence obtained may possibly lay a witness open to criminal charges. When such charges are made in a criminal proceeding, he then may demand the presence of his counsel for his defense. Until then his protection is the privilege against self-incrimination.[7] U. S. Const., Amend. V; Ohio Const., Art. I, § 10. See *Adamson v. California,* 332 U. S. 46, 52. This is a privilege available in investigations as well as in prosecutions. See *In re Groban,* 164 Ohio St. 26, 28, 128 N. E. 2d 106, 108, and 99 Ohio App. 512, 515, 135 N. E. 2d 477, 479–480; *McCarthy v. Arndstein,* 266 U. S. 34, 40; *Adams v. Maryland,* 347 U. S. 179. We have no doubt that the privilege is available in Ohio against prosecutions as well as convictions reasonably feared. Cf. *Ullmann v. United States,* 350 U. S. 422, 431. The mere fact that suspicion may be entertained of such a witness, as appellants believed existed here, though without allegation of facts to support such a belief, does not bar the taking of testimony in a private investigatory proceeding.

It may be that the number of people present in a grand jury proceeding gives greater assurance that improper

---

[5] *In re Black,* 47 F. 2d 542; accord, *United States v. Blanton,* 77 F. Supp. 812; see *United States v. Scully,* 225 F. 2d 113, 116.

[6] *Bowles v. Baer,* 142 F. 2d 787; *United States v. Levine,* 127 F. Supp. 651. Note, Rights of Witnesses in Administrative Investigations, 54 Harv. L. Rev. 1214, 1216–1217.

[7] Cf. *Ullmann v. United States,* 350 U. S. 422; *Hoffman v. United States,* 341 U. S. 479, 486; *Smith v. United States,* 337 U. S. 137, 150; *Hale v. Henkel,* 201 U. S. 43, 66–67.

use will not be made of the witness' presence. We think, however, that the presumption of fair and orderly conduct by the state officials without coercion or distortion exists until challenged by facts to the contrary. Possibility of improper exercise of opportunity to examine is not in our judgment a sound reason to set aside a State's procedure for fire prevention. As in similar situations, abuses may be corrected as they arise, for example, by excluding from subsequent prosecutions evidence improperly obtained.

Ohio, like many other States, maintains a division of the state government directed by the Fire Marshal for the prevention of fires and reduction of fire losses.[8] Section 3737.13, which has been in effect since 1900,[9] represents a determination by the Ohio Legislature that investigations conducted in private may be the most effective method of bringing to light facts concerning the origins of fires, and, in the long run, of reducing injuries and losses from fires caused by negligence or by design. We cannot say that this determination is unreasonable. The presence of advisors to witnesses might easily so far encumber an investigatory proceeding as to make it unworkable or unwieldy. And with so weighty a public interest as fire prevention to protect, we cannot hold that the balance has been set in such a way as to be contrary to "fundamental principles of liberty and justice." *Hebert* v. *Louisiana,* 272 U. S. 312, 316. That is the test to measure the validity of a state statute under the Due Process Clause.

Appellants urge, however, that the Fire Marshal's power to exclude counsel under § 3737.13 must be considered in the light of his power of summary punishment

---

[8] See National Fire Protection Association Handbook of Fire Protection (10th ed. 1948) 41–45; Annual Report of the Division of [Ohio] State Fire Marshal for 1955.

[9] Ohio Laws 1900, Senate Bill No. 51.

under § 3737.99 (A), and they would have us hold that, so considered, his power to exclude counsel was unconstitutional. We held in *In re Oliver,* 333 U. S. 257, that a witness before a one-man grand jury, a judge, could not constitutionally be punished summarily for contempt of the grand jury without being allowed to be represented by his counsel. We see no relation between the premise that appellants could not be punished without representation by counsel and the conclusion that they could not be questioned without such representation. Section 3737.13 may contain a constitutional flaw if it should be construed to authorize the exclusion of counsel while the Fire Marshal determines that a witness has violated § 3737.12 and orders the witness committed. The sole assertion of a constitutional violation that appellants relied upon before the Ohio Supreme Court and the only one open on the record here—the authorization in § 3737.13 of the exclusion of counsel while a witness testifies—is not well founded. We hold that appellants had no constitutional right to be assisted by their counsel in giving testimony at the investigatory proceeding conducted by the Fire Marshal, and that § 3737.13, insofar as it authorizes the exclusion of counsel while a witness testifies, is not repugnant to the Due Process Clause of the Fourteenth Amendment.

*Affirmed.*

Mr. Justice Frankfurter, whom Mr. Justice Harlan joins, concurring.

To whatever extent history may confirm Lord Acton's dictum that power tends to corrupt, such a doctrine of fear can hardly serve as a test, under the Due Process Clause of the Fourteenth Amendment, of a particular exercise of a State's legislative power. And so, the constitutionality of a particular statute, expressive of a State's view of desirable policy for dealing with one of

the rudimentary concerns of society—the prevention of fires and the ascertainment of their causes—and directed towards a particular situation, cannot be determined by deriving a troupe of hobgoblins from the assumption that such a particularized exercise of power would justify an unlimited, abusive exercise of power.

If the Ohio legislation were directed explicitly or by obvious design toward secret inquisition of those suspected of arson, we would have a wholly different situation from the one before us. This is not a statute directed to the examination of suspects. It is a statute authorizing inquiry by the chief guardian of a community against the hazards of fire into the causes of fires. To be sure, it does not preclude the possibility that a suspect might turn up among those to be questioned by the Fire Marshal. But the aim of the statute is the expeditious and expert ascertainment of the causes of fire. The Fire Marshal is not a prosecutor, though he may, like others, serve as a witness for the prosecution. In various proceedings, as for instance under some workmen's compensation laws, the presence of lawyers is deemed not conducive to the economical and thorough ascertainment of the facts. The utmost devotion to one's profession and the fullest recognition of the great role of lawyers in the evolution of a free society cannot lead one to erect as a constitutional principle that no administrative inquiry can be had *in camera* unless a lawyer be allowed to attend.

The assumption that as a normal matter such an inquiry carries with it deprivation of some rights of a citizen assumes inevitable misuse of authority. For good reasons, and certainly for constitutional purposes, the contrary assumption must be entertained. The potential danger most feared is that it will invade the privilege against self-incrimination in States where it is constitutionally recognized. But that privilege is amply safeguarded by the decision of the Supreme Court of Ohio in this case.

We are not justified in invalidating this Ohio statute on the assumption that people called before the Fire Marshal would not be aware of their privilege not to respond to questions the answers to which may tend to incriminate. At a time when this privilege has attained the familiarity of the comic strips, the assumption of ignorance about the privilege by witnesses called before the Fire Marshal is too far-fetched an assumption on which to invalidate legislation.

What has been said disposes of the suggestion that, because this statute relating to a general administrative, non-prosecutorial inquiry into the causes of fire is sustained, it would follow that secret inquisitorial powers given to a District Attorney would also have to be sustained. The Due Process Clause does not disregard vital differences. If it be said that these are all differences of degree, the decisive answer is that recognition of differences of degree is inherent in due regard for due process. We are admonished from time to time not to adjudicate on the basis of fear of foreign totalitarianism. Equally so should we not be guided in the exercise of our reviewing power over legislation by fear of totalitarianism in our own country.

For these reasons I join the opinion of the Court.

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

I believe that it violates the protections guaranteed every person by the Due Process Clause of the Fourteenth Amendment for a state to compel a person to appear alone before any law-enforcement officer and give testimony in secret against his will. Under the reasoning of the majority every state and federal law-enforcement officer in this country could constitutionally be given power to conduct such secret compulsory examinations.

This would be a complete departure from our traditional methods of law enforcement and would go a long way toward placing "the liberty of every man in the hands of every petty officer." [1]  By sanctioning the Ohio statutes involved here the majority disregards "this nation's historic distrust of secret proceedings" [2] and decides contrary to the general principle laid down by this Court in one of its landmark decisions that an accused ". . . requires the guiding hand of counsel at every step in the proceedings against him." [3]

The Ohio statutes give the state Fire Marshal and his deputies broad power to investigate the cause of fires. These officers can summon any person to appear before one or more of them to testify under oath. [4]  They can punish him summarily for contempt if he refuses to answer their questions or if he disobeys any of their orders. [5] They can exclude any person they wish from the examination, including the witness' counsel. [6]  After the questioning the Marshal or his deputy can arrest the witness if he believes that there is evidence sufficient to charge him with arson or a similar crime. [7]  Any statements taken from the suspect during these secret sessions must be turned over to the Prosecuting Attorney for use in any subsequent prosecution. [8]  An "Arson Bureau" is established in the Fire Marshal's office and it is provided with

---

[1] James Otis used this phrase in denouncing the Writs of Assistance and General Warrants in his famous argument in *Paxton's Case.* 2 The Works of John Adams (Boston 1850), App. 524.

[2] *In re Oliver,* 333 U. S. 257, 273.

[3] *Powell* v. *Alabama,* 287 U. S. 45, 69.

[4] Page's Ohio Rev. Code, 1953, §§ 3737.11, 3737.12.

[5] *Id.,* §§ 3737.12, 3737.99 (A).

[6] *Id.,* § 3737.13.

[7] *Id.,* § 3737.10.

[8] *Id.,* § 3737.10.

a staff charged with the duty of investigating fires to determine if a crime has been committed. The Fire Marshal and his deputy in charge of the "Arson Bureau" are expressly made ". . . responsible . . . for the prosecution of persons believed to be guilty of arson or a similar crime."[9] The statutory provisions show that the Fire Marshal and his deputies are given the ordinary duties of policemen with respect to "arson and similar crimes."

After appellants' place of business at Dresden, Ohio, burned down, a deputy fire marshal summoned appellants to appear before him with their business records to answer questions about the fire. According to their unchallenged affidavit, the Fire Marshal believed that they had started the fire. Appellants appeared before the deputy with their lawyer, stating that they were willing to testify fully but only if they could have their counsel present during the interrogation. The deputy informed them that the interrogation would be held in private and refused to admit their lawyer. Under these conditions they refused to testify. The deputy proceeded to hold them in contempt and ordered them imprisoned until they were willing to testify before him in secret. Appellants' counsel was not present at the time they refused to testify nor when they were adjudged in contempt and ordered imprisoned.

Appellants instituted this action for a writ of habeas corpus in a state court of Ohio contending that their imprisonment would be contrary to the Fourteenth Amendment. The Ohio Supreme Court rejected this contention and affirmed the judgments of lower state courts refusing to issue the writ. This Court upholds the decision below, but even on the narrow grounds upon which it chooses to decide the case I think that its holding

---

[9] *Id.,* § 3737.02.

is erroneous and constitutes a very dangerous precedent.[10] I believe that the judgments below should be reversed because it is contrary to due process of law to imprison appellants for refusing to testify before the Deputy Fire Marshal in secret.

A secret examination such as the deputy proposed to conduct is fraught with dangers of the highest degree to a witness who may be prosecuted on charges related to or resulting from his interrogation. Under the law of Ohio it seems clear that any statement allegedly secured from the witness may be used as evidence against him at a preliminary examination to justify his detention, before a grand jury to secure his indictment, and at the formal trial to obtain his conviction.[11] The witness has no effective way to challenge his interrogator's testimony as to what was said and done at the secret inquisition. The officer's version frequently may reflect an inaccurate understanding of an accused's statements or, on occasion, may be deliberately distorted or falsified. While the accused may protest against these misrepresentations, his protestations will normally be in vain. This is particularly true when the officer is accompanied by several of

---

[10] I would also reverse the decision below because appellants were found guilty of contempt and sentenced to jail in a proceeding where they were denied the benefit of counsel. This Court has expressly held that a person charged with contempt has a constitutional right to be heard through counsel of his own choosing at a trial on the contempt charge. *In re Oliver,* 333 U. S. 257. While the majority refuses to act on the denial here by claiming that appellants failed to challenge it in the Ohio Supreme Court or in their appeal to this Court, the record convinces me that the matter has been properly raised for our consideration. When a person is to be imprisoned as the result of a proceeding in which he was denied his constitutional rights, we should not be anxious to conclude that he has failed to raise the constitutional questions in the correct procedural form. Cf. *Aetna Ins. Co. v. Kennedy,* 301 U. S. 389, 393; *Hodges* v. *Easton,* 106 U. S. 408, 412.

[11] See generally 15 Ohio Jur. 2d, Criminal Law § 388.

his assistants and they all vouch for his story.[12] But when the public, or even the suspect's counsel, is present the hazards to the suspect from the officer's misunderstanding or twisting of his statements or conduct are greatly reduced.[13]

The presence of legal counsel or any person who is not an executive officer bent on enforcing the law provides still another protection to the witness. Behind closed doors he can be coerced, tricked or confused by officers into making statements which may be untrue or may hide the truth by creating misleading impressions. While the witness is in the custody of the interrogators, as

---

[12] In this respect it is important to note that under the Ohio statutes the Fire Marshal or his deputies may permit such persons as they wish to attend the interrogation.

[13] This has been recognized from ancient times. As said in Matthew 18:15-16:

"Moreover if thy brother shall trespass against thee, go and tell him his fault between thee and him alone: if he shall hear thee, thou hast gained thy brother. But if he will not hear thee, then take with thee one or two more, that in the mouth of two or three witnesses every word may be established."

Blackstone many centuries later noted that:

"[The] open examination of witnesses *viva voce,* in the presence of all mankind, is much more conducive to the clearing up of truth, than the private and secret examination taken down in writing before an officer, or his clerk . . . . There an artful or careless scribe may make a witness speak what he never meant . . . ." 3 Blackstone Commentaries 373.

And Bentham subsequently pointed out:

"In case of registration and recordation of the evidence, publicity serves as a security for the correctness in every respect (completeness included) of the work of the registrator.

"In case of material incorrectness, whether by design or inadvertence,—so many auditors present . . . any or each of whom may eventually be capable of indicating, in the character of a witness, the existence of the error, and the tenor (or at least the purport) of the alteration requisite for the correction of it." 1 Bentham, Rationale of Judicial Evidence (1827), 523.

a practical matter, he is subject to their uncontrolled will. Here it should be pointed out that the Ohio law places no restrictions on where the interrogations can be held or their duration. Exemplifying the abuses which may occur in secret proceedings, this Court has repeatedly had before it cases where confessions have been obtained from suspects by coercive interrogation in secret.[14] While the circumstances in each of these cases have varied, in all of them, as well as in many others, the common element has been the suspect's interrogation by officers while he was held incommunicado without the presence of his counsel, his friends or relatives, or the public. As was said in a concurring opinion in *Haley* v. *Ohio,* 332 U. S. 596, at 605: "An impressive series of cases in this and other courts admonishes of the temptations to abuse of police endeavors to secure confessions from suspects, through protracted questioning, carried on in secrecy, with the inevitable disquietude and fears police interrogations natually engender in individuals questioned while held incommunicado, without the aid of counsel and unprotected by the safeguards of a judicial inquiry." [15] Noth-

---

[14] See, *e. g., Fikes* v. *Alabama,* 352 U. S. 191; *Leyra* v. *Denno,* 347 U. S. 556; *Watts* v. *Indiana,* 338 U. S. 49; *Turner* v. *Pennsylvania,* 338 U. S. 62; *Harris* v. *South Carolina,* 338 U. S. 68; *Haley* v. *Ohio,* 332 U. S. 596; *Malinski* v. *New York,* 324 U. S. 401; *Ashcraft* v. *Tennessee,* 322 U. S. 143; *Ward* v. *Texas,* 316 U. S. 547; *White* v. *Texas,* 310 U. S. 530; *Chambers* v. *Florida,* 309 U. S. 227. For a discussion of the dangers and abuses arising from the secret interrogation of suspects by police see the report of the American Bar Association's Committee on Lawless Enforcement of the Law, Aug. 19, 1930. 1 Am. J. Police Science 575.

[15] In *United States* v. *Minker,* 350 U. S. 179, the Court, at p. 188, pointed out with regard to proposed examinations by immigration officers that: "It does not bespeak deprecation of official zeal, nor does it bring into question disinterestedness, to conclude that compulsory *ex parte* administrative examinations, untrammelled by the safeguards of a

ing would be better calculated to prevent misuse of official power in dealing with a witness or suspect than the scrutiny of his lawyer or friends or even of disinterested bystanders.[16]

A witness charged with committing contempt during the secret interrogation faces the gravest handicaps in defending against this charge. The interrogating officers may assert that he engaged in certain contumacious behavior before them and seek to imprison him. Even when the charges are tried by someone other than his interrogators,[17] the accused's efforts to show that the actual events were not as pictured by the interrogating officers would normally be futile if he could call on no one to corroborate his testimony. And when a witness is deprived of the advice of counsel he may be completely

---

public adversary judicial proceeding, afford too ready opportunities for unhappy consequences to prospective defendants in denaturalization suits."

[16] It seems wholly improper to "wait and see" in each case whether a witness has been coerced or tricked into giving involuntary statements at the secret interrogation and then to set aside convictions which may be based on such statements. This "abuse-by-abuse" approach fails to give the person interrogated sufficient protection. Usually he has no substantial chance of showing that the one or more interrogators used improper means to elicit involuntary statements from him. Only in the most extreme cases will this Court, or any other, be able to find that statements were made involuntarily in the face of the interrogating officers' testimony that they were spontaneous and freely given. Apparently in Ohio, as in most jurisdictions, the suspect faces the additional obstacle that his alleged statements are presumed to be voluntary and he has the burden of proving that they were not. See 15 Ohio Jur. 2d, Criminal Law § 387. In the few cases where a person interrogated could prove that his statements were made involuntarily he will still be subjected to considerable expense, inconvenience and unfavorable publicity. More important, he will already have suffered mistreatment at the hands of his interrogators.

[17] Here, of course, the interrogators were authorized to try the charges of contempt which they preferred.

unaware that his conduct has crossed the obscure boundary and become contemptuous. Moreover, executive officers will be somewhat more chary in exercising the dangerous contempt power if their actions are subject to external scrutiny.

I also firmly believe that the Due Process Clause requires that a person interrogated be allowed to use legal counsel whenever he is compelled to give testimony to law-enforcement officers which may be instrumental in his prosecution and conviction for a criminal offense. This Court has repeatedly held that an accused in a state criminal prosecution has an unqualified right to make use of counsel at every stage of the proceedings against him.[18]  The broader implications of these decisions seem to me to support appellants' right to use their counsel when questioned by the Deputy Fire Marshal.  It may be that the type of interrogation which the Fire Marshal and his deputies are authorized to conduct would not technically fit into the traditional category of formal criminal proceedings, but the substantive effect of such interrogation on an eventual criminal prosecution of the person questioned can be so great that he should not be compelled to give testimony when he is deprived of the advice of his counsel.  It is quite possible that the conviction of a person charged with arson or a similar crime may be attributable largely to his interrogation by the Fire Marshal.  The right to use counsel at the formal trial is a very hollow thing when, for all practical purposes, the conviction is already assured by pretrial examination.[19]

---

[18] See, e. g., Powell v. Alabama, 287 U. S. 45; Chandler v. Fretag, 348 U. S. 3.

[19] This was recognized in Ex parte Sullivan, 107 F. Supp. 514. There two persons suspected of crime had been examined by law-enforcement officers in secret without the presence of counsel and had been tricked into making statements which were instrumental in their conviction.  At pp. 517–518, the district judge observed:

"In view of [Powell v. Alabama, 287 U. S. 45], to mention but one

Looking at the substance of things, the Fire Marshal's secret interrogation contains many of the dangers to an accused that would be present if he were partially tried in secret without the assistance of counsel for "arson or a similar crime." Suppose that at the commencement of a criminal trial, the judge, acting under statutory authorization, expelled everyone from the courtroom but the prosecuting attorney and his assistants and allowed them to question the accused "privately." After such interrogation the doors were thrown open, the jury recalled, and the jurors given a résumé or transcript of the accused's purported testimony. And then the defendant's lawyer, who had been excluded from the secret examination, was allowed to make such defense as he could. Surely no one would contend that such a proceeding was due process of law. Yet the techniques as well as the end effects of the Fire Marshal's secret interrogation are substantially the same.

It is said that a witness can protect himself against some of the many abuses possible in a secret interrogation by asserting the privilege against self-incrimination. But this proposition collapses under anything more than the most superficial consideration. The average witness has little if any idea when or how to raise any of his constitutional privileges. There is no requirement in the Ohio statutes that the fire-prevention officers must inform the

---

of many cases, unquestionably Petitioners were entitled to have effective counsel *at the trial*. The question here is how they ever could have had effective counsel at the trial, no matter how skilled, in view of what went on before trial. They were denied effective counsel at the trial itself because of what went on before trial while the defendants were without counsel, and absolutely under the control of the prosecution. . . . One can imagine a cynical prosecutor saying: 'Let them have the most illustrious counsel, now. They can't escape the noose. There is nothing that counsel can do for them at the trial.' " (Emphasis not supplied.)

Also see Jackson, J., concurring in *Watts* v. *Indiana*, 338 U. S. 49, 57.

witness that he is privileged not to incriminate himself. And in view of the intricate possibilities of waiver which surround the privilege he may easily unwittingly waive it.[20]  If the witness is coerced or misled by his interrogators he may not dare to raise the privilege.  Undoubtedly he will be made aware that hanging over his head at all times is the officer's power to punish him for contempt—a power whose limitations the witness will not understand.  Furthermore, the Fire Marshal or his deputies would seldom be competent to decide if the privilege has been properly claimed or, even if they wish, to instruct the witness how to make correct use of it.

To support its decision that Ohio can punish a witness for refusing to submit to the Fire Marshal's secret interrogation, the majority places heavy reliance on the practice of examining witnesses before a grand jury in secret without the presence of the witness' counsel.  But any surface support the grand jury practice may lend disappears upon analysis of that institution.  The traditional English and American grand jury is composed of 12 to 23 members selected from the general citizenry of the locality where the alleged crime was committed.[21]

---

[20] See, *e. g.*, *Rogers* v. *United States*, 340 U. S. 367.

[21] All of the cases cited by the majority as authority for the practice before grand juries apparently involved a traditional grand jury. It has been suggested that a state can constitutionally provide for grand juries composed of less than 12 persons. See *In re Murchison*, 349 U. S. 133, 139, 140 (dissenting opinion); *In re Oliver*, 333 U. S. 257, 283, 283–284 (dissenting opinion).  Even if this suggestion is correct it certainly does not follow that a state can designate one or more of its law-enforcement officers as a grand jury and constitutionally give them power to compel witnesses to appear and give testimony in secret without the presence of counsel.  This point was expressly not considered in *In re Oliver, supra*, at 265.  Such power in the hands of law-enforcement officers is equally obnoxious to due process whether they are styled as a grand jury, as fire-prevention officers or simply as policemen.

They bring into the grand jury room the experience, knowledge and viewpoint of all sections of the community. They have no axes to grind and are not charged personally with the administration of the law. No one of them is a prosecuting attorney or law-enforcement officer ferreting out crime. It would be very difficult for officers of the state seriously to abuse or deceive a witness in the presence of the grand jury. Similarly the presence of the jurors offers a substantial safeguard against the officers' misrepresentation, unintentional or otherwise, of the witness' statements and conduct before the grand jury. The witness can call on the grand jurors if need be for their normally unbiased testimony as to what occurred before them.

The majority also relies on a supposed proposition that there is no right to use counsel in an administrative investigation.[22] Here it is relevant and significant to point out that in 1946 Congress specifically required in the Administrative Procedure Act that:

> "Any person compelled to appear in person before any agency or representative thereof shall be accorded the right to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative." [23]

In reporting the bill which was substantially enacted as the Administrative Procedure Act the Senate Judiciary Committee unanimously declared:

> "By enacting this bill, the Congress—expressing the will of the people—will be laying down for the guidance of all branches of the Government and all

---

[22] The only authorities offered by the majority as support for this proposition are three lower federal court decisions.

[23] 5 U. S. C. § 1005 (a).

> private interests in the country a policy respecting the minimum requirements of fair administrative procedure." [24]

And the House Judiciary Committee in reporting the House version of the Administrative Procedure Act stated:

> "The bill is an outline of minimum essential rights and procedures." [25]

Heretofore this Court has never held and I would never agree that an administrative agency conducting an investigation could validly compel a witness to appear before it and testify in secret without the assistance of his counsel.

In any event, the investigations authorized by the Ohio statutes are far more than mere administrative inquiries for securing information useful generally in the prevention of fires. Rather, these statutes command action with a view toward the apprehension and prosecution of persons believed guilty of certain crimes. The Marshal or his deputies may compel a person suspected of arson or a similar offense—as appellants apparently were—to appear and give testimony under oath. And as previously indicated any statement elicited from such person may be used as evidence against him. Once testimony has been taken from a suspect the duties of the Marshal and his deputies are not at an end. They must arrest the witness if they believe that the evidence is sufficient to charge him with certain crimes. All testimony taken from him and all other evidence must be turned over to the prosecuting attorney. The Fire Marshal and his deputy in charge of the "Arson Bureau" are specifically made ". . . responsible . . . for the prosecution of persons believed to be guilty of arson or a similar crime."

---

[24] S. Rep. No. 752, 79th Cong., 1st Sess. 31.

[25] H. R. Rep. No. 1980, 79th Cong., 2d Sess. 16.

The foregoing clearly demonstrates that the Fire Marshal's interrogation is, and apparently was intended to be, an important and integral part in the prosecution of the persons for arson or a similar crime.[26]  The rights of a person who is examined in connection with such crimes should not be destroyed merely because the inquiry is given the euphonious label "administrative." [27]

Finally it is argued that the Fire Marshal and his deputies should have the right to exclude counsel and such other persons as they choose so that their "investigatory proceedings" will not be "unduly encumbered."  From all that appears the primary manner in which the presence of counsel or the public would "encumber" the interrogation would be by protecting the legitimate rights of the witness.[28]  It is undeniable that law-enforcement officers could rack up more convictions if they were not "hampered" by the defendant's counsel or the presence of others who might report to the public the manner in which people were being convicted.[29]  But the procedural safe-

---

[26] It seems highly unrealistic to equate this interrogation with a proceeding involving a claim for workmen's compensation.

[27] Nor should they be defeated because the Fire Marshal and his deputies are given other duties besides investigating fires to determine if any criminality is involved.  For obvious reasons these other responsibilities do not make the interrogation proposed here any less objectionable.

[28] Perhaps, if a real need could be shown, counsel could be restricted to advising his client and prohibited from making statements or asking questions.  And there are other alternatives, much less drastic and prejudicial to the witness than the complete exclusion of his counsel, which might provide satisfactory protection for the witness without unduly impairing the efficiency of the examination.

[29] As Bentham said of criminal proceedings:
"Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.  Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance." 1 Bentham, Rationale of Judicial Evidence (1827), 524.

guards deemed essential for due process have been imposed deliberately with full knowledge that they will occasionally impede the conviction of persons suspected of crime.

The majority states that "with so weighty a public interest as fire prevention to protect," they cannot hold that it violates the Due Process Clause to compel a witness to testify at a secret proceeding. But is the public's interest in fire prevention so weighty that it requires denying the person interrogated the basic procedural safeguards essential to justice? Suppose that Ohio authorized the Chief of State Police and his deputies to inquire into the causes and circumstances of crime generally and gave them power to compel witnesses or persons suspected of crime to appear and give testimony in secret. Since the public's interest in crime prevention is at least as great as its interest in fire prevention, the reasoning used in the majority's opinion would lead to the approval of such means of "law enforcement." In fact, the opinion could readily be applied to sanction a grant of similar power to every state trooper, policeman, sheriff, marshal, constable, FBI agent, prosecuting attorney, immigration official,[30] narcotics agent, health officer, sanitation inspector, building inspector, tax collector, customs officer and to all the other countless state and federal officials who have authority to investigate violations of the law.[31] I believe that the

[30] See *United States* v. *Minker,* 350 U. S. 179.

[31] The Court's opinion does not deny that secret inquisitorial powers could be given such law-enforcement officers. A concurring opinion suggests that the grant of such broad power might be unconstitutional so far as a district attorney is concerned. However if policemen in general could constitutionally subject persons to secret compulsory interrogation, how can it be said that a district attorney could not? For constitutional purposes I can see no means of distinguishing this Ohio fire policeman from any other policeman or law-enforcement officer. Any attempted constitutional distinction between these various law-enforcement officers would be purely

majority opinion offers a completely novel and extremely dangerous precedent—one that could be used to destroy a society of liberty under law and to establish in its place authoritarian government.

No one disputes that Ohio has a great interest in the enforcement of its fire laws. But there is nothing which suggests that it is essential to adequate enforcement of these laws to give the Fire Marshal and his deputies the extreme powers of interrogation which they proposed to exercise here. This method of law enforcement has heretofore been deemed inconsistent with our system of justice. As MR. JUSTICE FRANKFURTER said in announcing the Court's judgment in *Watts* v. *Indiana,* 338 U. S. 49, at 54:

> "Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end. . . . Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation." [32]

artificial. The constitutionality of the Ohio law authorizing secret interrogation by fire marshals acting as policemen in arson cases should not be rested on a conjecture that such an artificial distinction will be drawn by this Court at some future day.

[32] A survey of British law reveals nothing which is equivalent to the type of examination that the Ohio Fire Marshal is allowed to conduct. Official inquiries into the cause of fires are generally made by the police. "[W]hen the police are inquiring into a case, they have no power to compel anyone to give them information; a witness may be compelled to attend a *court* and there give evidence, but before proceedings are actually brought he can refuse

Secret inquisitions are dangerous things justly feared by free men everywhere.[33] They are the breeding place for arbitrary misuse of official power. They are often

to say a word." Jackson, The Machinery of Justice in England (2d ed. 1953), 137. And in 1929 the Report of the Royal Commission on Police Powers and Procedure at p. 118 recommended that "A rigid instruction should be issued to the Police that no questioning of a prisoner, or a 'person in custody,' about any crime or offence with which he is, or may be, charged, should be permitted." It is doubtful if any statements obtained by the police by secret interrogation of a suspect would be admitted in evidence in a subsequent trial. See *Rex v. Grayson*, 16 Crim. App. R. 7 (1921); 43 Harv. L. Rev. 618; 43 Ky. L. Rev. 403.

In France official inquiries into fires are carried out as part of the general system of investigating crimes. The preliminary investigation is under the control of the public prosecutor and is conducted by the police. They have no authority to examine unwilling witnesses. The interrogation of such witnesses and of suspects is the function of the *Juge d'Instruction*, who is a judge with legal training. Prior to 1897 he had broad power to examine a witness under oath in secret without counsel. See Ploscowe, Development of Inquisitorial and Accusatorial Elements in French Procedure, 23 J. Crim. L. & Criminology 372. In 1882 Stephen commented on these secret proceedings as follows:

> "To a person accustomed to the English system and to English ways of thinking and feeling . . . the French system would be utterly intolerable in England. The substitution of a secret [interrogation] for our open investigation before the committing magistrate would appear to us to poison justice at its source."
> 1 Stephen, History of the Criminal Law of England (1883), 565.

In response to widespread demands French law was changed in 1897 to grant a witness appearing before the *Juge d'Instruction* the right to counsel. M. Constans, one of the sponsors of the law in the French Senate, said: "The *juge d'instruction* is like other functionaries. He must be controlled . . . The presence of the lawyer will of itself . . . prevent him from doing anything but his duty." Quoted in Ploscowe, *supra*, at 381. See also Esmein, History of Continental Criminal Procedure (1913); Keedy, The Preliminary Investigation of Crime in France, 88 U. Pa. L. Rev. 692.

[33] A leading Italian jurist recently said:

"The right to counsel, without which the right to defend oneself

the beginning of tyranny as well as indispensable instruments for its survival. Modern as well as ancient history bears witness that both innocent and guilty have been seized by officers of the state and whisked away for secret interrogation or worse until the groundwork has been securely laid for their inevitable conviction. While the labels applied to this practice have frequently changed, the central idea wherever and whenever carried out remains unchanging—extraction of "statements" by one means or another from an individual by officers of the state while he is held incommunicado. I reiterate my belief that it violates the Due Process Clause to compel a person to answer questions at a secret interrogation where he is denied legal assistance and where he is subject to the uncontrolled and invisible exercise of power by government officials. Such procedures are a grave threat to the liberties of a free people.

---

is of no practical meaning, does not exist during the first phase of the criminal process in those systems in which the pre-trial phase is carried out in secret without the presence of defense counsel. This is the phase in which the accused, alone and undefended before the examining magistrate, may be unable to find in his own innocence sufficient strength to resist the effects of prolonged questioning, and in order to put an end to his ordeal may be reduced to signing a confession to a crime he has not committed. Unfortunately, Italian criminal procedure retains this sad inheritance from an era of tyranny, which is unreconcilable with respect for the human personality . . . .

.     .     .     .     .

"In criminal procedure as we see it applied, the accused is still an inert object at the mercy of the inquisitor's violence. . . . Held incommunicado during the period of questioning, the accused is alone with his examiners, without aid of counsel; torture, although formally abolished, has returned under new guises more scientific but nonetheless cruel: the third degree, endless hours of incessant questioning, truth serum." Calamandrei, Procedure and Democracy (Adams transl. 1956), 93–94, 102–103.