**NATIONAL LAND & INVESTMENT COMPANY et al., Plaintiffs,**

**v.**

**Arlen SPECTER, Richard Sprague and Gilbert Stein, Defendants.**

**Civ. A. No. 69-2190.**

United States District Court
E. D. Pennsylvania.

Oct. 7, 1969.

Harold E. Kohn, Raymond J. Bradley, Philadelphia, Pa., for plaintiffs.

Arlen Specter, Dist. Atty., Philadelphia County, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

WOOD, District Judge.

This is an action for declaratory judgment and an injunction. The named plaintiffs assert jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202 and contend that the defendants are depriving them of rights guaranteed by the First, Fourth, Sixth, Ninth and Fourteenth Amendments to the Constitution and the Civil Rights Act, 42 U.S.C. §

1983 et seq. in connection with a state Grand Jury investigation of National Land. Specifically, it is alleged: that the defendants have acted under color of state law to chill the exercise of their rights of free speech and to support political candidates of their choice; that the plaintiffs are being denied the right of counsel and certain other procedural rights before the Grand Jury; and that because of the actions of the defendants in connection with the Grand Jury the plaintiffs are being deprived of their property rights without due process of law. We accepted jurisdiction,[1] and after a hearing and a review of the record we have concluded that the plaintiffs have not sustained their case and that their application for a preliminary injunction must be denied.

### FINDINGS OF FACT

1. Plaintiff, National Land and Development Company, is the developer of a project known as Centre Square, 1500 Market Street, Philadelphia, Pennsylvania. Properties Investment Corporation and the individual plaintiffs are the owners of National Land and Development Company.

2. Defendant Arlen Specter is the District Attorney of the City of Philadelphia. Defendant Richard Sprague is the First Assistant District Attorney of the City of Philadelphia.

3. The District Attorney commenced an investigation of the plaintiffs' project during February of 1969 (N.T. 409–11). The investigation was prompted in part by the filing of a Complaint in Equity by a member of the City Planning Commission against plaintiffs and the Redevelopment Authority of Philadelphia alleging certain conflicts of interest, improprieties and irregularities in connection with the project (N.T. 33–5).

4. In connection with the investigation, a Deputy District Attorney Gilbert Stein[2] contacted the plaintiffs Wolgin

---

1. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

2. Gilbert Stein was a defendant in this action. The action against him was withdrawn at the conclusion of the plaintiffs' case.

and Cohen for information. Mr. Wolgin referred Mr. Stein to Mr. Cohen, counsel for National Land. Mr. Stein was thereafter unable to obtain voluntarily from Mr. Cohen the information he sought. (N.T. 296–300)

5. On March 31, 1969, the District Attorney filed in the Court of Common Pleas of Philadelphia County a Petition requesting the convening of an investigating Grand Jury. The Petition requested that the Grand Jury "be specially charged to conduct an investigation of a wide assortment of wholly unrelated matters concerning which charges were made," including the 1500 Market Street Project. It was accompanied by an affidavit of the District Attorney which averred that several members of his office had been engaged in an investigation of the matters recited in the petition. (Ex. P–13)

6. In support of the Petition, the District Attorney averred "The existence of widespread corruption, numerous violations of law, serious crimes and systematic criminal depredation by public officers * * *" (Ex. P–13 ¶ 2(a)) and that he had made "diligent search, inquiry and investigation" into the matters covered in the Petition, but was "in need of the assistance to be derived from a Grand Jury investigation" (Ex. P–13 ¶ 3) "because numerous individuals [had] failed and refused to provide information, testimony and documents upon the specific request of [the District Attorney]." (N.T. 298–9, Ex. P–13, ¶ 2(d)).

7. The Petition further stated that the District Attorney had reliable and trustworthy information showing: that certain public officials had conspired to "give away without lawful justification property and assets of the City of Philadelphia" in connection with the 1500 Market Street project; that these officials and some whose identities had not been ascertained had improperly acted pursuant to their official positions to relieve National Land from several of its legal obligations for the improper purpose of gratuitously enriching its shareholders; that a member of the City Planning Commission had made several public charges concerning the 1500 Market Street project, including the charge that members of the Redevelopment Authority were guilty of unlawful conflicts of interest in regard to the project; that following these public charges, the member of the City Planning Commission and several others filed a suit in equity which related to the charges he had made concerning the 1500 Market Street project; that this suit had been abruptly settled and that the District Attorney despite diligent efforts had been unable to ascertain the circumstances and terms of the settlement or the circumstances surrounding the original transaction; and finally that the District Attorney had reliable and trustworthy information and evidence tending to show that certain public officials were part "of a system of similar or related improper acts whereby favored parties in interest * * are being improperly enriched at the public's expense" and that the aid of the Grand Jury with its subpoena power was necessary to fully investigate and expose these unlawful and improper acts. (Ex. P–13, ¶¶ 32–8)

8. On April 2, 1967, the Common Pleas Court granted the Petition of the District Attorney for an investigating Grand Jury, and on April 8 the Grand Jury was charged as requested in the Petition by the Honorable Joseph Sloane, who had been designated by the Administrative Judge of Philadelphia County to preside over the Grand Jury.

9. Since its convening, the Grand Jury has sat continuously except for a two week holiday and has heard a large number of witnesses and returned five presentments on various aspects of its investigation. (N.T. 410–11; 415–16)

10. Judge Sloane established uniform rules of procedure for the Grand Jury proceedings pursuant to which all witnesses are permitted to consult with counsel before, after, and during recesses in their testimony. Witnesses are also permitted to consult with counsel on the occasion of any plea of privilege in the

course of their testimony. (N.T. 186–7, 230–4) However, witnesses have not been permitted to have counsel present with them when testifying, nor have they been permitted to leave the Grand Jury room to consult with counsel concerning their testimony or questions put to them while testifying. (N.T. 187–8, Ex. P–10, pp. 2–3) Individual plaintiffs who have testified before the Grand Jury were directed not to discuss questions put to them and their answers with any person other than their own lawyer; and one attorney for several individual plaintiffs is not to discuss with one plaintiff what another plaintiff represented by the attorney had revealed concerning occurrences in the Grand Jury room. (N.T. 273)

11. The plaintiffs sought review of the order convening the Grand Jury as well as several rulings of Judge Sloane in the appellate courts of Pennsylvania. (N.T. 230–1) On August 27, the plaintiffs filed a petition to terminate the investigation as to them. This motion was heard and denied by the presiding judge on September 5, 1969, and no appeal was taken from that action.

12. The plaintiffs held a press conference on August 14, 1969 to state their views of the Grand Jury. They also on occasion have issued other press releases of similar import. (N.T. 235–43)

13. Financing for the 1500 Market Street project consists of three parts: Financing for buildings to be erected; financing for the land; and financing for temporary construction. (N.T. 22) Financing for the land was made available by way of a commitment of General Electric Pension Fund for approximately $13 million in a sale and leaseback transaction; financing for the permanent building of $63 million was to be participated in by the New York State Teachers Retirement System; and the New York City Employees Pension Fund; and temporary financing of $55 million was participated in by a group of 12 banks. (N.T. 24) The three parts of the financing are interdependent in that if the financing for one part is not forthcoming, the financing for the other parts may be cancelled as well. (N.T. 25)

14. On or about July 1, 1969, Deputy District Attorney Gilbert Stein sent a letter to several of the banks participating in the financing of the 1500 Market Street project stating that the Grand Jury of April Term 1969 was "currently conducting an investigation into alleged criminality in certain urban renewal activities", that the 1500 Market Street project and National Land were "among the subjects of investigation", that each bank was requested to appear before the Grand Jury on July 14 and that if they would not appear voluntarily, compulsory process would be arranged. (Court Ex. 1)

15. None of the persons to whom Stein sent letters on July 14 was called to testify during the week of July 14. (N.T. 98–9) Deputy District Attorney Stein sent letters to many of the lenders before July 14 stating that it would not be necessary to have them testify at that time. (Ex. P–5a)

16. On June 17, 1969, Deputy District Attorney Stein sent a letter to the Comptroller of the City of New York in response to an inquiry concerning the Grand Jury investigation. Stein stated *inter alia* that National Land, "its principals and its activities" and the project were under "an ongoing investigation * * * into allegations of criminality * * *." Stein further stated that "To date the grand jury has not yet made a presentment with regard to the 1500 Market Street or National Land & Investment Co. phases of its investigation." (Ex. P–6(a), 6(b)) On June 23, 1969, Stein sent a letter to the Comptroller of New York City enclosing a copy of the District Attorney's Petition and referring him to paragraph 32 thereof. (Ex. P–6(c))

17. As of September 25, National Land was precluded from going to settlement or closing for the financing of the 1500 Market Street project with the lenders because one of the prospective participants, the New York State Employees Retirement System, has refused

to go to settlement as long as the Grand Jury investigation continues. (N.T. 138)

## DISCUSSION AND CONCLUSIONS OF LAW

### I. *Denial of the Right to Free Expression*

Some consideration of the policy and standards employed where state criminal proceedings are collaterally attacked is appropriate before reaching the merits of the instant case. The propriety of a collateral attack and a grant of relief thereon has generally been determined after a consideration of two separate, but frequently overlapping, concerns: whether the traditional limitations on federal equitable relief are applicable; and whether abstention is appropriate.[3] Federal equity courts have traditionally assumed that state courts and prosecutors observe constitutional limitations and that the normal adjudication of constitutional defenses in the course of a state criminal proceeding would assure adequate and timely vindication of constitutional rights. As the Supreme Court stated in Douglas v. City of Jeannette, 319 U.S. 157 at 163–164, 63 S.Ct. 877 at 881, 87 L.Ed. 1324:

"* * * courts of equity in the exercise of their discretionary powers should conform to this policy (of leaving generally to the state courts the investigation and trial of criminal cases arising under state laws) by refusing to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent; and equitable remedies infringing this independence of the states—though they might otherwise be given—should be withheld if sought on slight or inconsequential grounds. * * *

"It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guarantees, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. * * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate.' "

The abstention doctrine, like the traditional limitations on federal equitable relief, also expresses the reluctance of federal courts to intervene in state proceedings. In a broad sense, abstention is a judicially-fashioned doctrine which allows a federal court to stay or dismiss proceedings until an issue of state law is authoritatively determined by a state court. See generally, 1 Barron & Holtzoff, Federal Practice and Procedure, § 64 (Wright Ed.1964); Wright, Federal Courts § 169 (1963); Note 73 Harvard L.Rev. 1358 (1960). See also Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

■ However, in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the Supreme Court held that where, as in the instant case,

---

3. These policies and their implications in a case such as the one before us are explored at length in Judge Will's opinion in Landry v. Daley, 288 F.Supp. 200 (N.D.Ill.1968).

the allegation is that a significant "chilling effect" on free speech is being created by a bad faith prosecution or threat of prosecution by state officials, the federal courts cannot abstain. If such allegations are proved, they constitute irreparable injury as a matter of law regardless of the outcome of state proceedings and the federal court must issue an injunction.[4] See Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Sheridan v. Garrison, 415 F.2d 699 (5th Cir., 1969); Machesky v. Bizzell, 414 F.2d 283 (5th Cir., 1969). Subsequently, in Cameron, the Court held that in order to make out such a case it was necessary to show that state officials had maintained or threatened to maintain proceedings:

" * * * in bad faith as harassing appellants' exercise of protected expression with no intention of pressing the charges or with no expectation of obtaining convictions, knowing that appellants' conduct did not violate the statute. * * *

" * * * the question for the District Court was not the guilt or innocence of the persons charged; the question was whether the statute was enforced against them with no expectation of convictions but only to discourage exercise of protected rights. The mere possibility of erroneous application of the statute does not amount 'to the irreparable injury necessary to justify a disruption of orderly state proceedings.' * * * The issue of guilt or innocence is for the state court at the criminal trial; the State was not required to prove appellants guilty in the federal proceeding to escape the finding that the State had no expectation of securing valid convictions." 390 U.S. 619, 620–622, 88 S.Ct. 1340.

4. We note in passing that at least with respect to free speech, the anti-injunction statute, 28 U.S.C. § 2283, which forbids federal courts from enjoining state proceedings unless "expressly authorized by Act of Congress, where necessary and in aid of its jurisdiction, or to protect or effectuate its judgments" is in this Circuit considered the codification of a rule of comity and would therefore not in an appropriate case preclude granting an injunction where explicitly authorized under the Civil Rights Act, 42 U.S.C. § 1983. See Cooper v. Hutchinson, 184 F.2d 119 (3rd Cir. 1950).

Although *Dombrowski* and its progeny have generally involved prosecution or threatened prosecution under a state statute relating to speech, its holding was apparently intended to apply to prosecution on any charge if it could be shown that the plaintiffs' right to free speech was thereby somehow significantly inhibited:

"If the state prosecution or trial on the charge of obstructing a public street or *on any other charge would itself clearly deny* their rights protected by the First Amendment, they may under some circumstances obtain an injunction in the federal court." City of Greenwood, Miss. v. Peacock, 384 U.S. 808, 829, 86 S.Ct. 1800, 1813, 16 L.Ed.2d 944 (1966) (emphasis ours).

■ In the instant case, the burden was therefore on the plaintiffs to show (a) that the proceedings in the state court were maintained in bad faith by the defendants, with no intention of pressing the charges or with any expectation of obtaining convictions, but knowing that the plaintiffs did not violate any law of the Commonwealth; and (b) that the investigation and threatened prosecution, if any, of the plaintiffs somehow inhibited their right to free speech in some significant manner. After review and consideration of the entire record, we have concluded that the plaintiffs have failed to sustain their burden of proof on all counts.

■ First, the plaintiffs have in no way demonstrated that the District Attorney or his subordinates have maintained the Grand Jury investigation in bad faith, without any expectation of ultimately indicting or prosecuting any of the plaintiffs, or knowing that the plaintiffs had not violated the statute.

The evidence does show that at the time he petitioned the Common Pleas Court to call a Grand Jury, the District Attorney was without information concerning several important aspects of the areas he was investigating; but his lack of information resulted from the fact that the plaintiffs, as they of course had a right to do, had declined to provide him with the information he needed to determine whether his investigation should be continued or not. In any event, the impaneling of the Grand Jury was sanctioned by the Common Pleas Court, and the members of the Grand Jury so convened have seen sufficient cause to continue the investigation. The Third Presentment of the Grand Jury rendered September 2, 1969, reported on the progress of the Grand Jury and stated that there were aspects of the case relating to National Land which merited further investigation. Neither the Court nor the members of the Grand Jury are joined as defendants in this action, and their good faith is in no way disputed.

▉ Secondly, the plaintiffs have failed to show us how their rights of free speech are in any way inhibited by the investigation or would be inhibited by eventual prosecution in connection with the areas under investigation. This is not a case, like most of the *Dombrowski* offspring, which involves prosecution under a statute regulating speech, but rather a case where the plaintiffs allege that they are prevented from "exercising their rights to speak freely and support candidates for public office"[5] because of bad faith investigation into areas not related to free speech. However, we see no limitation on the plaintiffs' right to free expression other than those imposed by the law relating to secrecy of the Grand Jury proceedings, which the plaintiffs do not contest here. The Court which charged the Grand Jury specifically told the plaintiffs in this regard that:

"* * * except as the law requires as to the secrecy of the Grand Jury

* * * anybody has a right to talk * * *. If there are falsehoods alleged, it's up to the proper persons to answer them. And he may answer them, whoever is concerned. * * * Every man has a right to speak in accord to law and truth. And for the abuse of truth and the abuse of law, he must take the consequences. This is not to be in the Grand Jury Room, as I have said. Other than that, these gentlemen, or any of them, may speak as he sees fit."

(pp. 6, 12–13, Ex. P–10, N.T. 266–7)

In short, we cannot see how the plaintiffs have been prevented from speaking with regard to their position in relation to the Grand Jury investigation, or with regard to political candidates of their choice. In fact the evidence shows that they have exercised these rights by calling press conferences outside the Grand Jury room on several occasions.

## II. *Denial of Constitutional Rights Before the Grand Jury*

In addition to their allegations of the abridgment of their First Amendment rights, the plaintiffs have alleged that other of their constitutional rights are being infringed in the proceedings before the Grand Jury. Under normal circumstances we would be loathe to consider or act upon such objections to the procedures adopted by state officials in the course of investigation or prosecution for violation of state statutes before those proceedings had terminated. As the Supreme Court stated in Cleary v. Bolger, 371 U.S. 392 at 397, 83 S.Ct. 385 at 388, 9 L.Ed.2d 390 (1963):

"Courts of equity traditionally have refused, except in rare instances, to enjoin criminal prosecutions. * * * The considerations that have prompted denial of federal injunctive relief affecting state prosecutions were epitomized in the *Stefanelli* case [Stefanelli v. Minard, 342 U.S. 117, 72 S. Ct. 118, 96 L.Ed. 138], in which this Court refused to sanction an injunc-

5. Requested Conclusion of Law, No. 4.

tion against state officials to prevent them from using in a state criminal trial evidence seized by state police in alleged violation of the Fourteenth Amendment:

'[W]e would expose every State criminal prosecution to insupportable disruption. Every question of procedural due process of law—with its far-flung and undefined range—would invite a flanking movement against the system of State courts by resort to the federal forum, with review if need be to this Court, to determine the issue. Asserted unconstitutionality in the impaneling and selection of the grand and petit juries, in the failure to appoint counsel, in the admission of a confession, in the creation of an unfair trial atmosphere, in the misconduct of the trial court—all would provide ready opportunities, which conscientious counsel might be bound to employ, to subvert the orderly, effective prosecution of local crime in local courts. To suggest these difficulties is to recognize their solution.' 342 U.S., at 123–124, 72 S.Ct. at 121, 122."

See also Sheridan v. Garrison, 415 F.2d 699 (5th Cir., 1969). However, because under the circumstances of this case the regularity of the Grand Jury proceedings might conceivably relate to the issues previously considered concerning the First Amendment, we will proceed to briefly consider here the issues raised by the plaintiffs.

■ The plaintiff's first objection to the ruling of the state court that they are unable to have the assistance of counsel before the Grand Jury, and that they are unable to leave the Grand Jury at will to consult with their attorney. Pursuant to the order of the Court, the plaintiffs who have been called before the Grand Jury have been permitted to consult with their attorney before testifying, after testifying, at intermission of the Grand Jury's deliberations, and when they raise a claim of privilege which is taken before the Court for a ruling. There is over-

whelming precedent that these procedures are constitutionally unobjectionable. In In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957), the Supreme Court countenanced proceedings under an Ohio Statute in which a Fire Marshal held investigatory proceedings to determine the cause of fires. Under the applicable statute, the Marshal was empowered to make the proceedings private and to "exclude from the place where [the] investigation is held all persons other than those required to be present", 352 U.S. 331, 77 S.Ct. at 512. The Court there concluded that:

"The fact that appellants were under a legal duty to speak and that their testimony might provide a basis for criminal charges against them does not mean that they had a constitutional right to the assistance of their counsel. * * * A witness before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel, nor can a witness before other investigatory bodies. * * * Obviously * * * evidence obtained may possibly lay a witness open to criminal charges. When such charges are made in a criminal proceeding, he then may demand the presence of his counsel for his defense. Until then his protection is the privilege against self-incrimination." 352 U.S. 330 at 332–333, 77 S.Ct. 510 at 513, 1 L.Ed.2d 376.

See also Jones v. United States, 119 U.S. App.D.C. 284, 342 F.2d 863, 882 (1964); In re Black, 47 F.2d 542, 543 (2nd Cir., 1931); Directory Services, Inc. v. United States, 353 F.2d 299, 301 (8th Cir. 1965); United States v. Wolfson, 282 F.Supp. 772 (S.D.N.Y.1967); United States v. Goldenberg, 276 F.Supp. 898, 900 (S.D. N.Y.1967).

■ The second objection of the plaintiffs is to the order of proceedings of the Grand Jury and to what they allege to be the denial of certain procedural rights normally accorded defendants in accusatory proceedings, such as the right to cross-examine witnesses and to present evidence in rebuttal. This misconceives the basic nature of the Grand Jury pro-

ceeding. As the Supreme Court stated recently in Jenkins v. McKeithen, 395 U.S. 411 at p. 430, 89 S.Ct. 1843 at p. 1853, 23 L.Ed.2d 404:

"* * * The grand jury * * * need not provide all the procedural guarantees alleged by appellant to be applicable to the Commission. As this Court noted in *Hannah* [Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307], 'the grand jury merely investigates and reports. It does not try.' 363 U.S. at 449, 80 S.Ct. 1544. Moreover, '[t]he functions of that institution and its constitutional prerogatives are rooted in long centuries of Anglo-American history.' *Id.*, at 489–490, 80 S.Ct. at 1544. * * * Finally the grand jury is designed to interpose an independent body of citizens between the accused and the prosecuting attorney and the court. See Stirone v. United States, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960) * * *."

In the same respect, the Court at an earlier time said with regard to the right of a witness to complain of the procedures in a grand jury investigation:

"He is not entitled to set limits to the investigation that the grand jury may conduct. * * * It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning." Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L. Ed. 979 (1919).

III. *Denial of Property Without Due Process of Law*

Finally, the plaintiffs have contended that the defendants by their part in the Grand Jury investigation have acted under color of state law to deprive them of their property rights because the Grand Jury investigation of National Land has cast a cloud of suspicion over the 1500 Market Street project. It is alleged in this respect that the plaintiffs are suffering irreparable harm because the project will be delayed or destroyed because certain lenders who are providing financing for the project will not go to closing because of the pendency of the Grand Jury investigation.

■ We find this contention wanting in merit for at least three reasons. First, since we have already concluded that the plaintiffs have failed to prove that the defendants acted in bad faith and that there was any constitutional infirmity in the Grand Jury proceedings, even if we were to conclude that the plaintiffs had suffered some financial loss, that loss would be no different from that suffered any citizen who is called to testify before a lawfully constituted Grand Jury investigation. As previously noted, except for the law relating to the secrecy of the Grand Jury, the plaintiffs are in no way precluded from explaining their affairs to anyone. Secondly, to the extent that the plaintiffs' complaint in this respect is grounded upon the Civil Rights Act, 42 U.S.C. § 1983 it must fail because this statute was not intended as a basis for redress of property or monetary rights. See Ream v. Handley, 359 F.2d 728 (Seventh Cir. 1966) and cases therein. Thirdly, we do not think that the plaintiffs have carried their burden of establishing the probability of substantial direct, immediate, and irreparable harm to their project if this Court does not act. The President and Chairman of the Board of National Land did testify that in his opinion the closing of financing was being delayed because in his opinion one of the participants, the New York State Employees Retirement System, refuses to go to settlement as long as the Grand Jury investigation continues. (N.T. 138) However, the plaintiffs did not demonstrate to us what the consequence of this delay would be. The

same witness expressed some apprehension that a proposed tenant of the project might no longer be bound by the existing lease agreement if construction were not completed by late 1971, but he seemed uncertain about whether there was a term in the existing lease providing for a two-year grace period in the event of circumstances beyond the landlord's control. (N.T. 143).

Because we conclude that the plaintiffs have not sustained any of their allegations and because they have not demonstrated irreparable harm, the motion for a preliminary injunction must be denied.

Finally, we assert that our Court, as a Court of original jurisdiction based on federal law, is not as some would seem to believe, a Court of appellate jurisdiction over state courts. The Civil Rights Act has developed a field of federal jurisdiction, but in our opinion it was never intended to be a haven for every disgruntled litigant in the state courts. To the contrary, abstention and comity require us to use extreme diligence in determining federal relief where there has been protected adjudication in the state court which is obviously the posture of the case before us.