Victor **MADERA**, **Ramiro Madera and Manuela Madera, Plaintiffs-Appellees,**

v.

**BOARD OF EDUCATION OF the CITY OF NEW YORK, Bernard E. Donovan, as Superintendent of Schools of the City of New York, Theresa S. Rakow, as District Superintendent for District One in the City of New York, Defendants-Appellants.**

No. 502, Docket 31346.

United States Court of Appeals Second Circuit.

Argued June 8, 1967.

Decided Dec. 6, 1967.

York City (Rhoda Karpatkin, Leah Marks, Carl Rachlin, Stephen M. Nagler, New York City, of counsel), for American Jewish Congress, New York Metropolitan Council and others, as amici curiae.

John DeWitt Gregory, Mineola, N. Y. (Allen Redlich, Syosset, N. Y., of counsel), for Nassau County Law Services Committee, Inc., as amicus curiae.

Lubell & Lubell, New York City (Jonathan W. Lubell and Stephen L. Fine, New York City, of counsel), for New York City Chapter of the National Lawyers Guild as amicus curiae.

Robert Projansky, New York City, for Harlem Social Workers' Action Committee as amicus curiae.

Vladeck, Elias, Frankle, Vladeck & Lewis, New York City (Max H. Frankle, Everett E. Lewis, and Zachary Wellman, New York City, of counsel), for Council of Supervisory Assns. as amicus curiae.

Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

On February 2, 1967, plaintiff Victor Madera, was a 14-year-old student in the seventh grade in Junior High School No. 22, District No. 1 of the New York City public school system. On that date, after a period of more than a year of behavioral difficulties, Victor was suspended from school by the principal. Victor's principal notified the District Superintendent of District No. 1, Miss Theresa Rakow, of the suspension. Miss Rakow notified Victor's parents, requesting their presence at a Guidance Conference to be held in her office on February 17, 1967, with regard to Victor's suspension.

After Victor's parents received the notice, they sought the aid of legal counsel who wrote to Miss Rakow asking to appear on behalf of Mr. and Mrs. Madera and their son at the conference. Miss Rakow's office advised the attorney that he could not attend the conference. General Circular No. 16 (1965–1966), promulgated by the Board of Education of

John J. Loflin, New York City, Office of the Corp. Counsel, City of New York (J. Lee Rankin, Corp. Counsel, and Luis M. Neco, New York City, of counsel), for defendants-appellants.

Robert Sugarman, New York City, (Harold J. Rothwax and Sue Ann Shay, New York City, on the brief), for plaintiffs-appellees.

David I. Ashe, Robert Carter, William Chisholm, Kenneth W. Greenawalt, David Haber, Herbert A. Heerwagen, Rhoda H. Karpatkin, Whitman Knapp, Richard L. Levinson, Leah Marks, Stephen M. Nagler, Burt Neuborne, Gregory J. Perrin, Carl Rachlin, George Schiffer, William A. White, and Ray H. Williams, New

the City of New York and the Superintendent of Schools, provides:

"Inasmuch as this is a guidance conference for the purpose of providing an opportunity for parents, teachers, counselors, supervisors, et al., to plan educationally for the benefit of the child, attorneys seeking to represent the parent or child may not participate." (page 5).

On February 16, 1967, the Maderas sought and obtained a temporary restraining order from the district court, restraining appellants:

"From holding any proceeding at which the plaintiffs may be affected and, particularly, from conducting the 'Assistant Superintendent's Hearing' scheduled for February 17, 1967, without permitting plaintiffs' legal counsel to be present and to perform his tasks as an attorney."

After a trial, the district court issued a permanent injunction and held that "the right to a hearing is a due process requirement of such constitutional significance as to void application of defendants' 'no attorneys provision' to the District Superintendent's Guidance Conferences." 267 F.Supp. at 373. Defendants, the Board of Education, have appealed the issuance of that injunction. Pending the decision of the appeal, this Court on May 1, 1967, granted a stay.

■■ At the very outset it should be made clear what this case does *not* involve. First, the Guidance Conference is not a criminal proceeding; thus, the counsel provision of the Sixth Amendment and the cases thereunder are inapplicable. Second, there is no showing that any attempt is ever made to use

any statement at the Conference in any subsequent criminal proceeding. The record is to the contrary (186–87),[1] and the district court so found, 267 F.Supp. at 372. Therefore, there is no need for counsel to protect the child in his Fifth Amendment privilege against self-incrimination.

■ The issue is one of procedural "due process" in its general sense, free from the "specifics" of the Fifth and Sixth Amendments. What constitutes due process under any given set of circumstances must depend upon the nature of the proceeding involved and the rights that may possibly be affected by that proceeding. Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Thus, it will be necessary to describe the nature and purpose of the District Superintendent's Guidance Conference in some detail.

Article XI, Section 1 of the New York Constitution states that "the legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." In New York, a person over five and under twenty-one is "entitled" to attend the free public schools in the school district or city in which he resides. § 3202(1), New York Education Law, McKinney's Consol. Laws, c. 16. Attendance at school is a statutory requirement for minors between the ages of seven and sixteen. § 3205(1), Education Law.

The suspension of a pupil who is insubordinate or disorderly or who endangers the safety or morals of himself or other minors, is authorized by section 3214(6) of the Education Law.[2] There

---

1. The numbers refer to pages of the stenographer's minutes of the trial.

2. Section 3214 subd. 6 provides:
    6. Suspension of a minor. a. The school authorities, the superintendent of schools, or district superintendent of schools may suspend the following minors from required attendance upon instruction:
    (1) A minor who is insubordinate or disorderly;

(2) A minor whose physical or mental condition endangers the health, safety, or morals of himself or of other minors;

(3) A minor who, as determined in accordance with the provisions of part one of this article, is feebleminded to the extent that he cannot benefit from instruction.

b. Procedure after suspension. In the case of a minor who is suspended

are two kinds of suspensions, the "principal suspense" (meaning by the "principal" of a school) and the "administrative suspense." Under the principal suspense the school principal has the authority to suspend the child from classes for a period of no more than five days. Generally, the principal tries to meet with the parents of the child to try to solve the problem before the suspension, but sometimes the situation requires an immediate suspension with a later conference before the child is returned to school. Normally, a principal suspense does not require any consideration by the District Superintendent. (168–170).

If the principal feels that a simple suspension will not solve the problem, he may suspend the child and refer the suspension to the District Superintendent. This is what is referred to as an "administrative suspense," a suspense which remains in effect pending an administrative decision. Section 3214(6)(b) vests the responsibility for dealing with the suspended child with the District Superintendent. There is no statutory requirement that a parent be granted a hearing prior to invoking this power. Cosme v. Board of Education, 50 Misc.2d 344, 270 N.Y.S.2d 231 (1966), affirmed without opinion, 27 App.Div.2d 905, 281 N.Y.S.2d 970 (1st Dept. 1967). Section 3214, subd. 5(a) requires only that a hearing be held prior to sending a child to a special day school or to confinement. However, pursuant to procedure promulgated by the Board of Education of the City of New York and the Superintendent of Schools and distributed in General Circular No. 16, hearings, or "Guidance Conferences," relating to the suspension are held in all cases. The principal, after suspending the student, notifies the parents that a conference will be held and the District Superintendent's office notifies them of the date of the conference.

In attendance at the Guidance Conference are the child and his parents, the principal, the guidance counselor of the suspended child's school, the District Superintendent, her assistant, the guidance counselor assigned to her office, and the school-court coordinator assigned to the district. If the parents do not speak English, they may bring an interpreter with them or one will be provided. In addition to his parents, the suspended child may have a representative from any social agency to whom the family may be known, attend the Guidance Conference. Students and their parents have never been represented at any of these Conferences by counsel. (184–85).

The function of the school-court coordinator is to provide a liaison between the Family Court and the schools. He interprets to the court "the program and facilities" of the school and he "interprets to the school the decisions of the court and the recommendations of the courts." (171). In some cases the Family Court may make use of the District Superintendent's decision at the Guidance Conference, and when requested to do so by the court, it is the school-court coordinator who takes this information to the court. In such a case, the court would receive only the school record of the child containing the fact that the child had been suspended and some notation as to where he had been transferred or where he had been placed after the suspense. (355–56). Apparently as a matter of convenience, the school-court coordinator will also take notes at the Guidance Conference. (180). However, it is clear that no statements made during such a preliminary conference could be admitted into evidence at any adjudicatory hearing before the Family Court. Section 334 of the Family Court Act provides that "No statement made during a preliminary conference may be admitted into evidence at an adjudicatory hearing

---

as insubordinate or disorderly, immediate steps shall be taken for his commitment as provided in this section, or for his attendance upon instruction elsewhere; in the case of a minor

suspended for other cause, the suspension may be revoked whenever it appears to be for the best interest of the school and the minor to do so.

under this act or in a criminal court at any time prior to conviction." [3]

The District Superintendent's guidance counselor coordinates the activities of the District Superintendent's office with the Bureau of Child Guidance. The guidance counselor takes notes and keeps records of the Guidance Conference. When the child returns from suspension, the guidance counselor helps to place him in the proper school situation. (172).

At the Guidance Conference it is made clear to the parents and the child that it is not intended to be punitive, but it is, rather, an effort to solve his school problems. Each one present, including the child if he is old enough, is asked what he thinks should be done and contributes to the discussion. Sometimes either the parents or the child will be asked to step outside for a moment so that one might discuss problems that would be difficult to discuss in front of the other. (173–74).

"The sole purpose of the conference is to study the facts and circumstances surrounding the temporary suspension of this student by his school principal, and to place the child in a more productive educational situation. At these conferences the assistant superintendent interviews the child, his parents and school personnel to learn the cause of the child's behavior. The conference is conducted in an atmosphere of understanding and cooperation, in a joint effort involving the parent, the school, guidance personnel and community and religious agencies. There is never any element of the punitive, but rather an emphasis on finding a solution to the problem.

"After full and careful study and discussion a plan is formulated to deal more adequately with the problems presented by the child. Every effort is bent towards the maintenance of a guidance approach. The emphasis is on returning the child as rapidly as possible to an educational setting calculated to be most useful to him." [4]

At the very beginning of the conference, the District Superintendent's staff may gather to go over the school records and background of the case before the parents and child arrive, but the parents are asked what they think should be done with the child and "no decision is made until the parent and child have participated" (303).

It is important to note that there are only three things that can happen to a student as a direct result of the District Superintendent's conference:

1. The suspended child might be reinstated in the same school, in the same or a different class, or

2. The suspended child might be transferred to another school of the same level, or

3. The suspended child—but only with the parents' consent—might be transferred to a special school for socially maladjusted children. (Gen. Circular No. 16).

Schools for socially maladjusted pupils (formerly known as "600" schools) were established about eighteen years ago. They are schools which are provided with special services for rehabilitation of children who are socially maladjusted or are problem children. These schools have smaller classes, specially trained teachers and special programs. More money is allocated to them so that they are able to provide more equipment and field trips for the children. (100–101). There is evidence that these schools are presently inadequate to meet the needs of the New York public school system,[5] but no practical alternative has been offered for educating the disruptive child. (445–51). It is undoubtedly true that a certain

3. Parenthetically, it may be noted that in the Family Court where a charge of juvenile delinquency was made by a teacher, Victor was represented by counsel, a right given by section 728 of the New York Family Court Act.

4. Affidavit of Bernard E. Donovan, Superintendent of Schools.

5. Dr. Bernard Mackler, A Report on the "600" Schools: Dilemmas, Problems, and Solutions (Plaintiff's Exhibit 3).

social stigma attaches to being placed in a school for socially maladjusted children. But this is true of many decisions of educational placement, such as, deciding not to promote a child or to remove him from a rapid advancement class or even the decision to give him a low or failing mark. Furthermore, the only schools for socially maladjusted children to which the District Superintendent could refer a child after a Guidance Conference are those which provide for attendance during regular school hours as in any other school. (236). In deciding as to which school to refer the child, an effort is made to reduce any stigma by sending him to a school out of the neighborhood if possible. (246).

Thus, aside from a decision that the child should be returned to the school he has been attending, the District Superintendent is only authorized finally to decide that the child be transferred to another school. The most that is involved is a change of school assignment. However, after the Guidance Conference, the District Superintendent may also:

4. Refer the student's case to the Bureau of Child Guidance or other social agency for study and recommendation, or

5. Refer the case to the Bureau of Attendance for court action. (Gen. Circular No. 16).

If the compulsory school attendance law, § 3205, Education Law, is being violated, it is the responsibility of the Bureau of Attendance to take the matter to the Family Court. If, after the guidance conference, the District Superintendent determines that the child should be enrolled in a special school for socially maladjusted children, his parents are told to report to that school with the child. The written consent of the parent or person in parental relation to the child, is necessary before he may be required to attend a school for socially maladjusted children. § 3214, subd. 5(a), Education Law. However, if the parents refuse to give such consent they may be prosecuted for violation of the compulsory education laws. §§ 3214, subd. 5(c)(1), 3212,

subd. 2(b). If the child does not report for admission, the Bureau of Attendance is notified and appropriate action is commenced in the Family Court.

The Bureau of Child Guidance (BCG) is the "clinical arm of the Board of Education. Its employees are social workers, psychologists, and psychiatrists." (175). When the District Superintendent refers a child to the BCG, it makes a study of the child "as seems indicated to help" the District Superintendent or to advise her "of what may be [the] best educational placement." (176). The BCG has no authority to order a particular placement for a child, but can only recommend various alternatives to the District Superintendent. (307–08). What these alternatives are would depend on the individual child but, in general, they are the following:

1. The child is able to attend school but should be sent to a school with a particular kind of program.

2. The child should be sent to a special day school for socially maladjusted pupils or a residential institution where the Board of Education operates such a school.

3. The child should be instructed at home.

4. The child should be temporarily exempted from school while his parents seek institutional help.

5. The child should receive a medical suspension or exemption.

6. The child should be exempt from school. (176).

I.

▆▆ The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." Thus it has long been clear that where a government affects the private interest of an individual, it may not proceed arbitrarily, but must observe due process of law. Wynehamer v. People, 13 N.Y. 378 (1856).

" * * * The 'liberty' mentioned in that amendment means, not only the right of the citizen to be free from the

mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." Allgeyer v. State of Louisiana, 165 U.S. 578, 589, 17 S.Ct. 427, 431, 41 L.Ed. 832 (1897).

It has been held that any action that would effectively deny an education must meet with the minimal standards of due process.

"  *   *   * It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society. Without sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens." Dixon v. Alabama State Board of Education, 294 F.2d 150, 157 (5th Cir.), cert. denied, 368 U.S. 930, 83 S.Ct. 368, 7 L.Ed.2d 193 (1961).

See also Wasson v. Trowbridge, 382 F.2d 807 (2d Cir. 1967); Knight v. State Board of Education, 200 F.Supp. 174 (M.D.Tenn.1961). These cases, however, involved an expulsion from school. The result of the action by the educators in an expulsion case would have been the drastic and complete termination of the educational experience in that particular institution.[6] But no case has yet to go so far as to hold that various trial type hearing requirements apply to such proceedings as in the present case. The trial court cites Woods v. Wright, 334 F.2d 369 (5th Cir. 1964), for the proposition that "Arbitrary expulsions *and suspensions* from the public schools are also constitutionally repugnant on due process

grounds." 267 F.Supp. at 373 (emphasis supplied). Although *Woods* did deal with a short suspension, it was an appeal from the refusal of a district court to grant a temporary restraining order. The court specifically stated that the due process question was "not properly before us for decision." 334 F.2d at 374. Furthermore the point of *Woods* was not procedural due process but a violation of First Amendment rights. In the present case, the child has already been suspended and the determination for the District Superintendent's Guidance is how that child may best be returned to the educational system. Quite the opposite of the problem in *Wasson, Dixon, Knight,* and *Woods,* supra.

As noted above, it is the school principal that initially issues the administrative suspense. After this preliminary suspension, aside from a decision that the child should return to the school he has been attending, the District Superintendent's Guidance Conference is only authorized finally to decide whether or not he should be transferred to another school. At most what is involved would be a change of school assignment.

The court below found that "a 'Guidance Conference' can *ultimately* result in loss of personal liberty to a child or in a suspension which is the functional equivalent of his expulsion from the public schools or in a withdrawal of his right to attend the public schools." 267 F. Supp. at 369 (emphasis supplied). The difficulty with this holding is, of course, the word "ultimately." The trial court by a series of hypothetical assumptions, in effect, turned a mere Guidance Conference relating to Victor's future educational welfare into a quasi-criminal adversary proceeding. The possibilities of Youth House, the Psychiatrist Division of Kings County Hospital or Bellevue Hospital, institutionalization, or attendance enforcement proceedings were mentioned. 267 F.Supp. at 371–372. When, as and if, in the future, Victor or his parents find themselves faced with

6. The *Knight* case involved an indefinite suspension which was deemed the equivalent of an expulsion.

charges in the Family Court, there would seem to be adequate safeguards in the law for preservation of their constitutional rights, including the right to counsel. Family Court Act § 741. At the most, the Guidance Conference is a very preliminary investigation, if it can be considered an investigation at all. After the conference, aside from a school reassignment, if any, a whole series of further investigations, hearings and decisions must occur before the child is subjected to any of the "serious consequences" which the district court suggested "flow for the juvenile involved in a District Superintendent's Guidance Conference." 267 F.Supp. at 370. The real question is at what point along this chain is the full panoply of due process safeguards to apply.

> "The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective. * * *" Opp Cotton Mills v. Administrator, 312 U.S. 126, 152–153, 61 S.Ct. 524, 536, 85 L. Ed. 624 (1941).

While it is arguable that in view of the limited character of the action that may be taken, a Guidance Conference cannot result in a deprivation of "liberty" within the meaning of the Fourteenth Amendment, the contrary will be assumed for present purposes and the question whether the due process clause requires the presence of counsel at such a conference will be considered forthwith.

## II.

If due process is applicable to such a conference, it would not follow that the school must permit the presence of counsel. The "differing rules of fair play" encompassed by the concept of due process "[vary] according to specific factual contexts * * * and differing types of proceedings." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed. 2d 1307 (1960).

> "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. * * * ' "[D]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' It is 'compounded of history, reason, the past course of decisions * * *.' Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 162–163, 71 S.Ct. 624, 95 L. Ed. 817 (concurring opinion)." Cafeteria and Restaurant Workers Union v. McElroy, supra, 367 U.S. at 895, 81 S.Ct. at 1748.

In Dixon v. Alabama Board of Education, supra, which was relied upon heavily by the court below, the Fifth Circuit Court of Appeals recognized that "The minimum procedural requirements necessary to satisfy due process depend upon the circumstances and the interests of the parties involved." 294 F.2d at 155. The court set forth in some detail the due process safeguards it deemed necessary in an expulsion proceeding and, significantly, those due process requirements did not include the right to counsel.

> "For the guidance of the parties in the event of further proceedings, we state our views on the nature of the notice and hearing required by due process prior to expulsion from a state college or university. They should, we think, comply with the following standards. The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such cir-

cumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled." 294 F.2d at 158–159.

Similarly, the court in Knight v. State Board of Education, supra, stated that, "the conclusion appears inescapable upon the present record that the rudiments of fair play and the requirements of due process vested in the plaintiffs the right to be forewarned or advised of the charges to be made against them and to be afforded an opportunity to present their side of the case before such drastic disciplinary action was invoked by the university authorities." 200 F.Supp. at 178. Again there was no mention of representation by retained counsel.

The trial court seemed to think that once due process requires a hearing, the right to representation by counsel follows automatically. In support of this conclusion, it cites Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

"What, then, does a hearing include? Historically and in practice, in our own country at least, it has always included the right to the aid of counsel when desired and provided by the party asserting the right. * * *" at 68, 53 S.Ct. at 64.

But Powell was a criminal case heard before a court of law. Later in the same paragraph quoted above, Justice Sutherland went on to note:

" * * * If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." At 69, 53 S.Ct. at 64 (emphasis supplied).

The present situation is the polar opposite from the criminal trial as depicted, for example, in Gideon v. Wainwright, 372 U.S. 335, 344–345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). There the Court stressed the unfairness of a lawyerless defendant being opposed by a government lawyer-prosecutor in an adversary proceeding where liberty is at stake. Here the District Superintendent has no lawyer present, does not regard the proceeding as adversary, and the child's liberty is not in peril.

■ The right to representation by counsel is not an essential ingredient to a fair hearing in all types of proceedings.

" * * * The utmost devotion to one's profession and the fullest recognition of the great role of lawyers in the evolution of a free society cannot lead one to erect as a constitutional principle that no administrative inquiry can be had in camera unless a lawyer be allowed to attend." In re Groban, 352 U.S. 330, 336, 77 S.Ct. 510, 515, 1 L.Ed. 2d 376 (Frankfurter, J., concurring).

For example, due process is not denied because a person is refused the right to be represented by counsel in a hearing before a draft board. United States v. Sturgis, 342 F.2d 328 (3d Cir. 1965); Niznik v. United States, 173 F.2d 328 (6th Cir. 1949); United States v. Pitt, 144 F.2d 169 (3d Cir. 1944).

In In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957), the Supreme Court held that a person had no constitutional right to be assisted by retained counsel in giving testimony at an investigatory proceeding conducted by a Fire Marshal. There the Court stated:

"It is clear that a defendant in a state criminal trial has an unqualified right, under the Due Process Clause, to be heard through his own counsel. Chandler v. Fretag, 348 U.S. 3 [75 S.Ct. 1, 99 L.Ed. 4.] Prosecution of an individual differs widely from administrative investigation of incidents damaging to the economy or dangerous to the public. The proceeding before the Fire Marshal was not a criminal trial, nor was it an administrative proceeding that would in any way adjudicate appellants' responsibilities for the fire. It was a proceeding solely to elicit facts relating to the causes and circumstances of the fire. * * *" at 332, 77 S.Ct. at 512.

"The fact that appellants were under a legal duty to speak and that their testimony might provide a basis for criminal charges against them does not mean that they had a constitutional right to the assistance of their counsel. Appellants here are witnesses from whom information was sought as to the cause of the fire. A witness before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel, nor can a witness before other investigatory bodies. There is no more reason to allow the presence of counsel before a Fire Marshal trying in the public interest to determine the cause of a fire. Obviously in these situations evidence obtained may possibly lay a witness open to criminal charges. When such charg-

es are made in a criminal proceeding, he then may demand the presence of his counsel for his defense. Until then his protection is the privilege against self-incrimination. * * *" at 332–333, 77 S.Ct. at 513 (footnotes omitted).

Because, after the hearing the Fire Marshal can arrest the witness if he believes that there is evidence sufficient to charge him with arson or a similar crime (at 338, dissenting opinion), Groban would seem to have presented even a stronger case for allowing the presence of counsel than the present case which does not at all purport to investigate possible criminal activity or to prosecute. The holding in In re Groban was followed in Anonymous v. Baker, 360 U.S. 287, 79 S.Ct. 1157, 3 L.Ed.2d 1234 (1959). See also Nason v. Immigration and Naturalization Service, 370 F.2d 865 (2d Cir. 1967), where this Court held that a witness was not entitled to have a lawyer present at a preliminary interrogation by the Immigration and Naturalization Service even where the witness might become the object of a deportation proceeding.

Recent Supreme Court decisions concerning procedures of the juvenile courts are not to the contrary. Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), involved the referral of a youthful offender from the juvenile court to the adult criminal court. The Court there stressed the "tremendous consequences" of such a decision and held that before it was made, the juvenile was entitled to a hearing and to the assistance of counsel. But the "tremendous consequences" to which the Court was referring in that case were "that the child will be taken from the Receiving Home for Children and transferred to jail along with adults, and that he will be exposed to the possibility of a death sentence instead of treatment for a maximum, * * * until he is 21." 383 U.S. at 553–554, 86 S.Ct. at 1053.

In In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court held that due process required that

in a proceeding to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parents must be notified of the child's right to be represented by retained counsel, or if they are unable to afford counsel, that counsel will be appointed to represent the child. However, in writing for the majority, Justice Fortas clearly implied that the right to counsel does not exist at early stages of procedures involving juveniles:

"The Nat'l Crime Comm'n Report recommends that 'Juvenile courts should make fullest feasible use of preliminary conferences to dispose of cases short of adjudication.' * * * Since this 'consent decree' procedure would involve neither adjudication of delinquency nor institutionalization, nothing we say in this opinion should be construed as expressing any views with respect to such procedure. The problems of pre-adjudication treatment of juveniles, and of post-adjudication disposition, are unique to the juvenile process; hence what we hold in this opinion with regard to the procedural requirements at the adjudicatory stage has no necessary applicability to other steps of the juvenile process." At 31, 87 S.Ct. at 1445, note 48 (citations omitted).

The Guidance Conference clearly is a preliminary conference not an adjudication. As said in Cosme v. Board of Education, supra, 270 N.Y.S.2d at 232:

" * * * These hearings are simply interviews or conferences which include school officials and the child's parents. Further, they are purely administrative in nature, and are never punitive. The parents are fully apprised of all of the facts and are furnished with copies of all information in respondent's possession." Cosme v. Board of Education, supra, at 232.

What due process may require before a child is expelled from public school or is remanded to a custodial school or other institution which restricts his freedom to come and go as he pleases is not before us.

Appellees here argue that the presence of a lawyer is necessary because it is he "who has the communicative skill to express the position of the student's parents when—because of lack of education, inarticulateness, or simply awe at the array of highly educated and articulate professionals in whose presence they find themselves—they may themselves be unable to do so, * * * " (Appellees' Brief, p. 15). However, it does not appear that a lawyer could solve this communication problem. Actually the trial record supports the view, despite some testimony to the contrary (141–49), that the social worker, who is allowed to attend the Guidance Conference, would provide more adequate counsel to the child or the parents than would a lawyer.

Appellees also argue that the presence of counsel is necessary because the decision of the Guidance Conference depends to a certain degree on the school's statement of the child's misbehavior and that this statement may be incorrect. In the present case there were eleven incidents of misbehavior reported by seven different teachers. The mere attendance of counsel at the conference would do little to aid this problem without also granting the other rights accorded in adversary proceedings—calling of witnesses, cross-examinations, etc. To do so would be destructive of the original purpose of the Guidance Conference—to provide for the future education of the child. The conference is not a judicial or even a quasi-judicial hearing. Neither the child nor his parents are being accused. In saying that the provision against the presence of an attorney for the pupil in a District Superintendent's Guidance Conference "results in depriving plaintiffs of their constitutionally protected right to a hearing" (267 F.Supp. at 373), the trial court misconceives the function of the conference and the role which the participants therein play with respect to the education and the welfare of the child. Law and order in the classroom should be the responsibility of our respective educational systems. The courts should not usurp this function and turn disciplinary

problems, involving suspension, into criminal adversary proceedings—which they definitely are not. The rules, regulations, procedures and practices disclosed on this record evince a high regard for the best interest and welfare of the child. The courts would do well to recognize this.

### III.

While it is most doubtful that there is any basis in law or fact for considering Victor Madera and his parents to be representatives of, and champions for, a class, a ruling on this point becomes unnecessary in view of the decision that the complaint must be dismissed for failure to state a claim on which relief can be granted.

Judgment reversed; injunction vacated and complaint dismissed.