Robert F. WASSON, Jr., Plaintiff,

v.

Alexander B. TROWBRIDGE, etc., et al.,
Defendants.

No. 67 C 412.

United States District Court
E. D. New York.

May 7, 1968.

dures used in the plaintiff's disciplinary proceedings at the United States Merchant Marine Academy comported with due process of law which, as the Court of Appeals has held (382 F.2d 807, 812) "requires for the dismissal of a Cadet from the Merchant Marine Academy that he be given a fair hearing at which he is apprised of the charges against him and permitted a defense." The Court of Appeals directed attention specifically to three points (382 F.2d at 813), *first,* whether the Regimental Board of Investigation which heard the plaintiff's case had such prior contact with his case that they could be presumed to have been biased; *second,* whether plaintiff was seriously prejudiced by a denial of a postponement of his hearing in order to obtain favorable witnesses; and *third,* whether the Board failed to disclose to plaintiff the evidence against him or any of it and the reasons for so doing if it was done.

At the time in question plaintiff was a Second Classman (i. e., a Junior) at the Merchant Marine Academy at Kings Point, New York [46 U.S.C. § 1126(b) (1)]. The Disciplinary Regulations of the Corps of Cadets emphasized that standards of discipline must necessarily be high since offenses tolerable in civilian life are intolerable aboard ships where human life and valuable property can be jeopardized by want of discipline. The Regulations say that it is "a stern disciplinary necessity that makes the * * * Academy require of her Cadets a character for trustworthiness that allows no evasion."

Article 200.00, after stating that a high standard of discipline must be maintained at the Academy, states that, "It is considered serious misconduct for any Cadet, alone or in concert with others, to adopt any measure—oral or written—for the purpose of violating or evading any Academy rule or regulation. No Cadet, alone or in concert with others, shall commit any act contrary to the rules of good order or discipline, or endeavor to induce others to commit such an Act." Article 200.03 of the Disciplinary Regu-

Sidney Romash, Brooklyn, N. Y., and Burt Neuborne, New York City, for plaintiff.

Michael Rosen, Brooklyn (Joseph P. Hoey, U. S. Atty., of counsel), for defendants.

MEMORANDUM (Incorporating Findings of Fact) and ORDER

DOOLING, District Judge.

A hearing has now been held upon remand of the present case to this Court on the question whether the proce-

lations defines as deficiencies in conduct violations of regulations, the commission of acts to the prejudice of good order and military discipline, or the failure to measure up to the standards of a Cadet and gentleman; it provides that deficiency shall be punished in accordance with established regulations and that the demerits awarded shall determine a Cadet's Conduct Grade. The classification of offenses and the general procedural structure are outlined in the opinion of the Court of Appeals and need not be repeated. See 382 F.2d 807, 810–811.

The hearing on remand explored the precise course of the investigation, the hearing before the Regimental Board of Investigation, and the procedure before the Senior Board of Aptitude, Conduct and Discipline Review; the hearing went also into the extent of the matter known to the investigating officer which was not disclosed to plaintiff and which, if it had been disclosed to plaintiff, he contends he might have attempted to meet through the production of witnesses.

The episode giving rise to the disciplinary proceedings was serious in its total dimension, in part because it involved a mass movement by a relatively large number of Cadets of several classes, and it struck at the Cadet Regimental chain of command. The episode evidently grew out of a background of dissatisfaction with activities of the Cadet Regimental Commander and Regimental Executive Officer; it took the shape of what was—in general correctly—characterized as "an unauthorized mass movement to Regimental Row for the purpose of throwing the Regimental Commander and Regimental Executive Officer in the Sound."

The episode took place on the evening of March 30, 1967. The Report of Deficiency on plaintiff is dated April 10, 1967; plaintiff's hearing before the Regimental Board of Investigation took place on April 13, 1967; the meeting of the plaintiff with the Senior Board of Aptitude, Conduct and Discipline Review took place on May 8, 1967; and the Senior Board's report recommending dismissal was made on May 11, 1967.

The episode occurred on the evening of March 30th which was a Thursday. Apparently the Regimental Commander, Captain O'Leary, learned of the episode some time after it occurred on March 30, and as early as six-thirty on the following morning he had talked to Midshipman van Oss, the Cadet Regimental Commander who had been one of the two objectives of the mass movement of the preceding evening. Formal organized attention to the matter was deferred however until 10 or 11 A.M. on Friday, March 31st, at which time the regular weekly meeting between the Cadet Command Board and the Regimental Commander and other Academy Officers took place. The officer staff of the Regimental organization included three Lieutenant Commanders, Boyle, Litchfield and Hannigan, each of whom commanded one of the three battalions making up the Academy's complement, and their assistants, two of whom were Lieutenants De Filippi and McCammon; Captain O'Leary, too, had an assistant. There were also, apparently night watch officers.

At the meeting with the Regimental Officers on March 31 six of the eight Cadet members of the Command Board were present, including van Oss and the Cadet Regimental Executive Officer, Teague. Of the Regimental Officers of the Academy, Captain O'Leary was present as were Commanders Litchfield and Hannigan, Lieutenants Junior Grade McCammon and De Filippi, Chief Warrant Officer McCaffrey and Mr. Ash. The meeting lasted until it broke up for lunch, and the conferees discussed the previous evening's episode for about an hour.

Captain O'Leary, the senior officer present, and the person responsible for Academy discipline, was emphatic that the offense of the previous evening was one against organization and discipline rather than against the Cadet Officers, and that it was important to determine

who had led and who had participated in it. van Oss was, or said he was, unable to identify any of the people involved and no Cadet's name was mentioned except that of Cadet Pillsbury. The Cadet Command Board emphasized the importance or, at least, the value of determining why the episode had occurred.

The meeting broke up with the Command Board under a general impression that it had the role of coming up with a decision, or suggesting a solution and communicating it to the officer staff of the Academy later in the day, after the last class of the day. Evidently in consequence of this some kind of arrangement was worked out among the Cadets under which it was contemplated that Cadet Pillsbury, then a second classman, would report to Captain O'Leary and present himself as a person who was responsible as a leader or instigator because he had been present and although an upper classman had—effectively—participated and had not done anything to suppress the occurrence or bring it to an end. The thought was that such an avowal would head off broader proceedings and end the matter. Pillsbury went to the Administration Building probably around two o'clock with that mission in mind.

At about 2:00 P.M. the officer staff, or apparently at least Captain O'Leary, Commanders Litchfield and Hannigan, Lieutenants De Filippi and McCammon and Chief Warrant Officer McCaffrey, reconvened further to consider the matter. Cadet Pillsbury came to the officers at that time and avowed his participation in the episode. It quickly became apparent, however, that the Cadet Command Board was not in control of the situation, and that the project on which he was embarked was impossible of accomplishment. In consequence of that at a later hour, probably somewhere about 3:00 P.M. he went to Captain O'Leary's office and in confidence told him and Commander Hannigan the full story as he believed it to have occurred. There appears to be no doubt that in Pillsbury's recital plaintiff Wasson's name appeared prominently and in a leadership role, and that Cadets of the Third Battalion, Commander Hannigan's Battalion, were deeply involved in the mass movement.

After the close of the two o'clock meeting, over the Academy's public address system, two sections of the Third Battalion, Sections 363 and 368, were directed to report to the Administration Building. All cadets of the two sections who were at the Academy assembled in the Administration Building. Commander Hannigan then called out the Section 368 cadets and some 5 or 10 minutes later dismissed them as not substantially involved. The Section 363 cadets were directed to remain.

Plaintiff Wasson was in Section 363, but he had left the Academy some time around noon with the rest of the Academy Sailing Team for a competition that was to be held on the weekend at the United States Naval Academy. Plaintiff did not return to the Academy until late on the night of Sunday, April 2d or in the very early morning hours of Monday, April 3d. He was not therefore —as were the other Section 363 cadets— interrogated on March 31.

Each of the Section 363 cadets was called separately into the Board Room for interrogation. Captain O'Leary, Commanders Litchfield and Hannigan, Lieutenants McCammon and De Filippi and Chief Warrant Officer McCaffrey were present. The six members of the Cadet Command Board and Cadet Pillsbury were in the room and remained throughout the interrogation of the Cadets but played no active part in the further proceedings.

Commander Hannigan was the interrogator, and he had a relatively few questions, four or five, which he addressed to each cadet. Questions were occasionally interjected by Commander Litchfield and possibly by Lieutenant De Filippi. (Both Commander Litchfield and Lieutenant De Filippi had also asked some questions during the early morning meeting, and Commander Litchfield

if not Lieutenant De Filippi had asked some questions of Pillsbury during his session with the officer staff.) Commander Hannigan's questions were simple and direct. The cadet was asked whether he had been present in Regimental Row at the time of the occurrence, whether he had participated in it, why he had participated in it, how he had found out that it was making up, and who else was present. Apparently none of the cadets implicated anyone other than himself, and it appears that none of them named plaintiff Wasson as having been present. The interrogation was brief and some of the twenty-one or so cadets interrogated remembered that they were asked whether they had laid their hands on anyone, or whether they had touched the Cadet Regimental Commander.

On Sunday, April 2, Pillsbury was called into Captain O'Leary's office rather casually and again went over the same ground covered in his talk with Captain O'Leary and Commander Hannigan on Friday. Commander Litchfield was on duty on Sunday, April 2, and it appears that he very likely was in Captain O'Leary's office, heard some or all of the repetition of the story by Pillsbury to Captain O'Leary, and may have asked one or more questions about it. There is some indication that Commander Litchfield heard some part of Cadet Galik's interview with Commander Hannigan on Monday, April 3d but this is far from clear and it does not appear that Commander Litchfield's participation in either of the two interviews had any particular dimension or significance.

Commander Hannigan as the officer in command of the Third Battalion properly became the investigating officer. He pursued the investigation with some direction from and some participation by Captain O'Leary. Commander Hannigan made incomplete notes of his interviews with the cadets; his notes include two handwritten memoranda of his interview with plaintiff.

Commander Hannigan's investigation was systematic; it involved interviews with all of the cadets in Section 363 and apparently some interviews with cadets in other sections. (It appears that there were seven sections in Commander Hannigan's Third Battalion but the only sections under suspicion were Sections 363 and 368, and, as noted above, the cadets in Section 368 were dismissed from inquiry as a result of the March 31 preliminary consideration of the matter.) Commander Hannigan interviewed some thirty of the cadets and made and preserved twenty-two pages of handwritten notes, some of which are mechanical pages containing lists of names or re-writings of interviews reflected in rougher form on other pages. The interviews were held either in Commander Hannigan's office or in a room in the Administration Building. Usually a Mr. Armbruster was available to Commander Hannigan to act in part as a messenger or summoner of the cadets. At one or two of the interviews Captain O'Leary may have been present.

The notes are in general legible and portray a conscientious and dispassionate effort to get to the bottom of a complex incident that evidently had its roots in dissatisfaction with cadet-imposed disciplinary measures or procedures or reports. Commander Hannigan testified that the broad inference that he drew from his investigation was that there were ringleaders and that the principal ones were Cadets Hamann and Wasson, who were roommates, and in addition to them Cadets Ellard, Pillsbury, Smith, Adams and Martucci. The interview notes indicate that Commander Hannigan interviewed all of the cadets except Adams and Martucci who were later charged.

Eleven cadets were charged in all. Commander Hannigan was responsible for the preparation of the Reports of Deficiency on the individual cadets. Each Report of Deficiency sets forth the charge, which in plaintiff's case was "disorderly and improper conduct," and the specifications, which in the case of plaintiff consisted of six items.

Probably on Monday April 10, 1967, plaintiff's name appeared on the Mast List which is published every day at about noon, and on that same day he received from the Administration an envelope containing the Report of Deficiency (including the charge and specificiations) together with a copy of the order convening a Regimental Board of Investigation and disclosing the membership of the Board. The Mast List was marked so as to indicate that plaintiff was required to file a responsive statement to the charge and plaintiff did prepare and submit a responsive statement under date of April 11, 1967. This was in accordance with Article 200.07(b) of the Disciplinary Regulations, which describe the Mast List procedure and provide that a responsive statement if submitted must be in writing and "shall consist of a straightforward account of the facts relating specifically to the charge. It should not contain irrelevant or improper material, and it must not be a medium for the submission of counter-charges. If the statement places responsibility on another cadet he must be named."

The Regimental Board of Investigation convened under Article 200.07(c) (3) and Article 200.08(a) did not include Commander Hannigan as he was the reporting and investigating officer but its members were Lt. Commander Litchfield of the 1st Battalion, Lt. Commander Boyle of the 2nd Battalion, and Lt. (j. g.) De Filippi of the 2nd Battalion; Chief Warrant Officer McCaffrey served as secretary of the Board.

After plaintiff received the Report of Deficiency he consulted with Professor Lazarra at the Academy. Professor Lazarra is an instructor in physics, and is not an attorney. Plaintiff asked Professor Lazarra for his assistance and advice which was fully and freely given, and given without charge of course. Professor Lazarra suggested that plaintiff consult with a lawyer and accordingly on April 12 plaintiff applied in writing to Captain O'Leary as Regimental Officer for a postponement of the Regimental Board in order to enable him to obtain and consult with legal counsel of his choice. On the same day Captain O'Leary as Regimental Officer replied that plaintiff's request for a postponement in order to consult legal counsel was disapproved.

Professor Lazarra also suggested and possibly drafted a protest against the appointment of Lt. Commander Litchfield, Lt. De Filippi and Chief Warrant Officer McCaffrey to the Regimental Board of Investigation. At any rate plaintiff and Cadets Hamann, R. J. Smith, Rollins, Reichart and Ellard together signed a written application, dated April 12, to the Regimental Officer for the appointment of a new Board in accordance with Article 200.08(a) on the ground that Lt. Commander Litchfield, Lt. J. G. De Filippi and Chief Warrant Officer McCaffrey had taken an active part in the investigation and interrogation of the incident which resulted in the charges, thus disqualifying them from participation in the Board. It appears that on April 12 plaintiff Wasson in person took the joint application to Captain O'Leary and that Professor Lazarra accompanied plaintiff when he presented it to Captain O'Leary. At that time Captain O'Leary left his office and went out to Professor Lazarra and told him that he thought the Professor was giving bad advice to Wasson and advice contrary to Academy regulations. From Captain O'Leary's viewpoint the participation of Hamann and Wasson in the protest against the membership of the Regimental Board of Investigation was improper since neither of them had been present at the Academy on March 31, and neither one of them had been a participant in the March 31 proceeding in which Messrs. Litchfield, De Filippi and McCaffrey had been present with the other officers. While Captain O'Leary did not consider that the other cadets who joined in the protest had a material ground of protest, he regarded their participation in the protest as standing in a different light, since they had been interrogated on March 31;

Captain O'Leary advised Reichart, when Reichart spoke to him, that he would be prepared to appoint night watch officers in place of those who had been nominated in the case of Reichart and the others.

To plaintiff Wasson Captain O'Leary replied on the same day that he had deliberately taken trouble to appoint a Board not involved in the investigation and interrogation of those involved in the incident and that to his knowledge the officers appointed to plaintiff's Board had never spoken to plaintiff or been present when plaintiff was interrogated as claimed in the memorandum that he signed. Captain O'Leary advised that it was his decision that the Board in plaintiff's case would remain as constituted. In the cases of Rollins and Reichart Captain O'Leary did appoint a substitute Board. Rollins and Reichart had also pressed the point before Commander Hannigan; he recommended against their request, indicating that it would mean the substitution of less experienced officers for the ones then on the Board, but he yielded to their insistence. Commander Boyle remained on the Boards that heard the cases of Rollins and Reichart but Messrs. Duncan and Benetto (?) were substituted for Messrs. Litchfield and De Filippi.

Plaintiff's Board hearing occurred on April 13 at about three o'clock or so in the afternoon. Commander Litchfield presided over the Board as Chairman. Plaintiff came in carrying a brief case and he was asked to remove that from the room. He did so, and came back carrying only the notes that he meant to use.

At the outset plaintiff was told that he would be asked questions but that he need not answer any of the questions, and that if he did not do so that fact would not be held against him. The charge and specifications were then read to him and he read his statement in response to the charge and specifications. Plaintiff was asked whether he had anything to add to his responsive statement or to change it. Then there were questions and answers, and at the end he was asked to state anything additional which he had to say, and he made a closing statement.

■ At some point in the proceeding Lt. Commander Litchfield recalls that plaintiff was asked whether he had any witnesses whose testimony he wished to offer and that plaintiff appeared somewhat surprised at the question but did not ask for an opportunity to present witnesses or indicate that he would have presented witnesses had he known that it was his right to do so. Commander Litchfield recalled that the only request that plaintiff had made of the Board was for permission to smoke and that permission was granted. Plaintiff's testimony was that he said, when he was asked whether he had any witnesses to present, that if he had known that he would be permitted to present witnesses, and had been granted the time to obtain them, he would most certainly have presented witnesses, and plaintiff says that Lt. Commander Litchfield then said, in substance, that it was not important anyway, and that the hearing was then closed. Neither Lt. Commander Boyle (who was not called as a witness) nor Lt. (j. g.) De Filippi were interrogated on this point, and there is nothing in the report of the Board which reflects the occurrence of such an incident. Plaintiff's testimony on this point is not borne out and is rejected.

Plaintiff's was not the first Board hearing that was held. Lt. De Filippi testified that he sat in eight of the eleven Boards and that no decision was made in any of them, so far as concerned him, until all had been heard. At each Board hearing after the first the members of the Board, or some of them, had heard versions of the episode as it affected other cadets.

The Board in plaintiff's case did not have any evidence before it other than the charge and specification in plaintiff's case, his responsive statement and what came out in answer to the Board's

questions and in plaintiff's voluntary statements. However, the Board necessarily had in mind the larger picture emerging from the participation of one or another of its members in other Boards.

The findings of fact, Nos. 1 through 9 on pages 2–3 of the Report of the Board in plaintiff's case, show certain details that are also in the notes of Commander Hannigan and not in the specification and responsive statement, but nothing suggests that the Commander Hannigan's notes were before the Board in any form, and the similarities of text reflect plaintiff's ability to supply such details. While an element of uncertainty is introduced because of the absence of any transcript and the presence in the findings of material not in the specification and responsive statement, there is no ground for inferring that any undisclosed evidence was before the Board. The only extraneous element would appear to be the generalized impression that members of the Board may have derived from sitting on cases of other cadets.

The nature and result of the Board hearing appears from the sequence of each specification, the directly responsive statement and the related finding of fact, and these are placed in the Appendix to this decision. They make it plain that the findings do not present any material going beyond the responsive statement except in the case of the finding related to specification 4. The point with respect to "Midshipmen in authority" turned on the question whether John Mazza was a Midshipman in authority and not on whether he had warned plaintiff. The point made, as appears from Finding 5 of page 3 of the Report of the Board, was that plaintiff did not know that Mazza was at that time First Platoon Commander of the Third Company and as such a person in authority. It was a part of plaintiff Wasson's own interview with Commander Hannigan (as appears from the notes, Exhibit 11–A) that Mazza had sought unsuccessfully to intervene.

Plaintiff and his roommate Hamann each received seventy-five demerits; Reichart and Pillsbury each received fifty demerits, and there is no evidence as to the number of demerits that others received. Since plaintiff had already accumulated one hundred and fifty-four demerits as a second classman, having been placed on report, in all, twenty-eight times and having been exonerated eight times, the matter was serious for plaintiff. As a second classman his maximum demerit allowance was 200 demerits under Article 200.13(b). When plaintiff exceeded that maximum allowance he became subject to dismissal from the Academy; the Regimental Officer, Captain O'Leary, was required to refer his case with recommendation to the Superintendent of the Academy, who could then convene the Senior Board of Aptitude, Conduct and Discipline Review to review the matter and determine whether or not the cadet should be retained. See Article 200.13(f).

Soon after plaintiff had received the decision of the Board of Investigation he communicated with his present trial counsel and from that point forward was advised by counsel. In addition to outside counsel plaintiff also in this interim period had Academy counsel. He consulted with Lieutenant Chavez and on the day when plaintiff ultimately appeared before the Senior Board he was accompanied by Lieutenant Kettlewell because Lieutenant Chavez was unavailable on that day.

Plaintiff had the right, under Article 200.11, to appeal the award of demerits, and he did appeal through the Battalion Officer, Regimental Officer and Assistant Superintendent to the Superintendent, and he was accorded a personal interview. The appeal to the Superintendent, Admiral McClintock, was taken within 2 or 3 days after plaintiff received the decision of the Board of Investigation. Plaintiff's interview with the Superintendent lasted about half an hour; he returned at a later date and was advised that his appeal was not allowed.

Under date of April 28, 1967, Captain O'Leary recommended to the Superintendent, pursuant to Article 200.13(f), that plaintiff appear before a Senior Board of Aptitude, Conduct and Discipline Review. The Superintendent convened a Senior Board and plaintiff was advised of the appointment of the Senior Board and of the date on which it would meet and would interview him. In the interim plaintiff's file was made available to him for his own review and plaintiff took advantage of the opportunity thus accorded him to review his file.

The Senior Board had a preliminary meeting on May 1 to discuss plaintiff's record and to see his personnel file. The Board met again on May 8, and at that time when plaintiff presented himself with Lieutenant Kettlewell, who remained outside the Senior Board meeting room, plaintiff presented to the Senior Board a communication, prepared by his present attorney, in which he requested an adjournment of the inquiry or hearing in order to give him an opportunity to select and consult with counsel of his own choice with a view to having them represent him at the inquiry or hearing. Plaintiff's outside counsel was not at the Academy on the day in question, since he was engaged elsewhere. The Senior Board received and read the document, and asked plaintiff to withdraw while the request was discussed; then plaintiff was asked to return and was advised that the request was denied.

The Senior Board had spent approximately a half hour together reviewing plaintiff's file and familiarizing themselves with its contents before plaintiff came into the room. Article 200.13(f) of the Disciplinary Regulations it is the function of the Senior Board to interview the Cadet, to review his entire discipline and conduct record at the Academy, and to determine whether or not the Cadet should be retained. That is what the Senior Board did in plaintiff's case. During the interview plaintiff told the Senior Board that some of the things of a commendatory nature that he had expected and had hoped would be in his file were not there. It was plaintiff's impression that the record was cold and contained no personality data. Nevertheless the plaintiff addressed himself to the Board in terms of his contention that he should be retained in the Academy.

The meeting occurred on May 8 and on May 11, the Senior Board unanimously recommended plaintiff's dismissal from the Academy. There appears to be no reason to doubt, and there is no evidence to contradict, the factual content of the report of the Senior Board of May 11, 1967, and there is nothing in its text to suggest either unfairness, bias, failure of comprehension, or departure from appropriate standards of evaluation in the circumstances of the case. The Senior Board does not review the Regimental Board of Investigation's decision. It treats that as an event already in the record. It reviews the cadet's entire record from the point of view of determining whether he is suitable material for Merchant Marine Command and has an aptitude for that life.

After the Senior Board rendered its report to the Superintendent plaintiff had a further meeting with the Superintendent in the nature of a further appeal; it was unsuccessful. The Superintendent approved the dismissal recommendation of the Senior Board and forwarded it to the Maritime Administrator for final action.

The threshold question is whether or not the Academy procedure in general and as applied in plaintiff's case conformed to due process requirements in that the Cadet was "given a fair hearing at which he [was] apprised of the charges against him and permitted a defense" and was "given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence" (382 F.2d at 812). See, e. g. Dunmar v. Ailes, D. C.1964, 230 F.Supp. 87, 90, aff'd, 1965, 121 U.S.App.D.C. 45, 348 F.2d 51, 54 and fn. 3.

It is evident from the foregoing that in no sense was the Board of Investiga-

tion an evidentiary hearing of the familiar sort. Its essential nature is most clearly seen from an examination of the Appendix showing the specification, the responsive statement and the finding with respect to each point of charge. It was made fairly evident that in the rare situation in which a genuine issue of fact arose the Academy's Board procedure was embarrassed by the absence of precedent for the use of witnesses whose testimony would be heard, cross-examined, and weighed by the Board as an integral part of its hearing. The underlying attitude was that the Board of Investigation was hardly the place for witnesses. The officers who testified made it fairly clear that the central procedural safeguard was not any adversary hearing procedure, confrontation or cross-examination, but was the responsibility with which the investigating officer conducted his work and the Regimental Officer reviewed the report of deficiency. Repeatedly the idea was put forward that the cadet's version of the facts would control, and that if the cadet challenged the report of deficiency in points of basic fact, the normal resort would have been to review the work of the investigating officer with him, at least initially, rather than to set up issues, summon in witnesses and in that way resolve the issue of fact as part of the Board hearing.

Even more evident was the idea that in general it was not to be expected that a responsible investigating officer would present or the Regimental Officer convene a Board to hear controvertible charges. The officers' visualization of the procedure plainly was that there would be no fundamental clash of fact between the report of deficiency and the cadet's responsive statement, and that, in consequence, the Board of Investigation functioned mainly as a forum in which explanations and extenuating circumstances were brought forward and the degree of the punishment worked out.

It follows that if it is essential that the procedure genuinely afford within its own four corners an opportunity to try out issues of fact, with the support of witnesses and evidence, such a procedure is not in use at the Academy and was not used in plaintiff's case. The procedures are not employed in that perspective. Cf. Dixon v. Alabama State Board of Education, 5th Cir. 1961, 294 F.2d 150, 158–159; Due v. Florida A. & M. University, N.D.Fla.1963, 233 F.Supp. 396, 403. See Madera v. Board of Education, 2d Cir. 1968, 386 F.2d 778, 783–786. While Article 200.07(b) (1) and (c) (1)–(4) appear to visualize a fact finding procedure, it rather appears that where there is an absence of agreement between the specification and the cadet's statement, deference is paid to the failure of the cadet to accept the specification as correct and to his counter-statement of the events. That seems at first an unlikely way of handling matters, but it is illustrated in the Appendix. The specification, response and findings in substance illustrates the retreat from the specification in evident deference to the cadet's statements, and this becomes very evident when Commander Hannigan's notes are referred to. From them it appears that a very different and more rigorous view of the plaintiff's conduct could readily have been taken both by Commander Hannigan in his specification and by the Regimental Board if it had insisted upon the maximum charge that the circumstances permitted and had sought evidence to support it. The elusive technique of adjudication is very likely rooted in the idea that the Regimental Board in its action is dealing with a prospective officer and a gentleman. He is expected, in the language of Article 200.03 "to measure up to the standards of a Cadet and a gentleman," and his statement is treated as coming from such a person.

While therefore it cannot be said that the procedure employed was so structured that it "permitted a defense * * * from the point of view of allowing time and the use of witnesses and other evidence" in the sense of enabling the Cadet to meet and controvert in any evidentiary proceeding the spec-

ifications of the charge, in the particular application of the essentially different procedure adopted there was no denial of basic due process simply because of the deference in fact paid to the Cadet's statement in his responsive statement to the charge and in his oral representations at the hearing. It does not appear that at any point any substantial statement on an issue of fact of the plaintiff's was rejected in favor of a harsher statement on the point of fact from the specification.

█ The generalized answer to the threshold question for the Academy procedure as a whole would then be that its procedures in general have not been so applied as to give a fair hearing in terms of apprising cadets of the charges against them and permitting them a defense from the point of view of allowing them time to prepare and to use witnesses and other evidence to controvert specifications in a manner approaching that recognized as the proper mode of trying an issue of fact in a Court.

█ On the three specific points of complaint it does not appear that plaintiff has borne the burden of proof.

*First*, Commander Litchfield was present at the March 31 proceeding as was Lt. De Filippi and Chief Warrant Officer McCaffrey.

The Warrant Officer's function appear to have been purely ministerial and his participation is unimportant from the point of view of avoiding a situation in which an investigating officer acts later as a trial officer on issues arising out of his own investigation.

Commander Litchfield cannot be said to have had any specific investigatorial duty assigned to him in the earlier stages of the case. If he was present at the interviews of Pillsbury and Galik with Captain O'Leary, there is no evidence that his participation was significant or that it operated upon his mind at any later stage. The active investigating officer was Commander Hannigan; Commander Litchfield's involvement in the active investigation was neither official nor significant. His presence on March 31 was certainly an official participation in a preliminary stage of the matter, and he evidently asked occasional questions of cadets, but it would be going too far to characterize what occurred on March 31 as constituting the investigation as distinguished from blocking out the area in which the investigation would take place and the direction it should pursue. It is concluded therefore that there was no disqualifying contact with the earlier stages of the case on the part of Commander Litchfield.

The connection of Lt. De Filippi with the early stages of the procedure was apparently confined to his presence at the March 31 proceeding and on the same basis it is concluded that his was not a disqualifying participation because of the preliminary nature of what was done on March 31st.

The *second* question is whether plaintiff was denied an adjournment he sought in order to obtain witnesses. As indicated above it is not found that plaintiff genuinely sought a continuance in order to obtain favorable witnesses. His requests for delay were solely related to the counsel point, and it is not apparent that at any time before the hearing on remand was any consideration given by plaintiff to the calling of witnesses or to the subject matters on which they might have testified. Had the procedure been one which lent itself readily to the calling of witnesses, it does not appear that there would have been any time problem in relation to the calling of witnesses. The Academy regarded, and reasonably regarded, the matter as one in which disciplinary action had to be taken quickly. Elaborate preparation and elaborate preparation time have no realistic application to the nature of the proceeding at the Academy.

Finally, it does not appear that, even in retrospect, plaintiff is able convincingly to point to issues upon which he could have presented relevant and material testimony.

The *third* point is whether or not plaintiff was fully told the evidence

against him and had an opportunity to meet it, or whether he was the victim of undisclosed evidence which he had no chance to meet.

The essential difficulty with the third point is its artificiality. There was nothing before the Regimental Board of Investigation except the specification, the statement of the cadet and his oral statements in response to interrogation at the Board hearing except the fact that some of the same officers had sat on other Boards hearing the cases of other cadets and necessarily would have had in mind ideas derived from that source. There is no way of demonstrating that such matter could not have crept into the determination without being articulately presented so that the plaintiff had an opportunity to meet it. But there is no intimation that plaintiff was confronted with any surprising matter, and the findings do not themselves remotely suggest the existence of evidence other than that manifest on the face of the papers reproduced in rearranged form in the Appendix, plus the numbered findings on page 2–3 of the Regimental Board's report.

Plaintiff reviewed the notes of Commander Hannigan carefully and said that the total picture of him which the notes portray emphasized that he was a leader in the episode to a degree which was false. Plaintiff said that if he had known that he was being conspicuously portrayed as a foremost leader and not simply because he was a second classman charged in the same way as other second classman who had been charged, he would have insisted upon calling witnesses and would have used them to show that his participation was not one of foremost leadership but that others were equally leaders with him.

Neither Commander Hannigan's notes nor the specification of the charge bear out of the extreme interpretation which plaintiff would put on them, nor does it appear from anything in the report of the Regimental Board of Investigation that plaintiff was improperly singled out along with Hamann. That only plaintiff

and Hamann received seventy-five demerits was at once apparent but denial of foremost leadership was not brought out as being a particular point of contention until at the hearing there was an insistence that plaintiff show what it was that he would have put in issue through witnesses.

█ But far more important is the fact that so far as the Regimental Board of Review is concerned it did not see Commander Hannigan's notes. Its determination was fairly supported in the responsive statement of the plaintiff and in the matter brought out in discussion with him in the course of the Regimental Board of Review.

It follows that the plaintiff has failed to make out a case for relief. It is accordingly

Ordered that the complaint be dismissed and that the Clerk is directed to enter judgment that plaintiff take nothing and that the action is dismissed on the merits.

### APPENDIX

1. *Specification:*

On the evening of 30 March 1967 because of your discontent with statements purportedly made by the Regimental Commander and Regimental Executive Officer, you joined other Midshipmen in an unauthorized mass movement to Regimental Row for the purpose of throwing the Regimental Commander and Regimental Executive Officer in the Sound. By your own admission you served as a leader of this unauthorized movement.

*Responsive Statement:*

The specification is true as stated.

*Finding:*

1. By his own statement and testimony before the Board, Midshipman Wasson did because of discontent with statements purportedly made by the Regimental Commander and Regimental Executive Officer, on the evening of 30 March 1967, join other Midshipmen in an unauthorized mass movement to Regimental Row for the purpose of throwing

the Regimental Commander and Regimental Executive Officer in the Sound.

2. *Specification*:

You violated Study Hall procedures and changed to an unauthorized uniform.

*Responsive Statement*:

C/Wasson was in the complete dungaree uniform minus hat. No hats in the Battalion area is a privilege granted to members of the Second class.

*Finding*:

None.

3. *Specification*:

You fomented discontent by knocking on doors, telling other Midshipmen to change clothes and encouraging them to join in the mass movement. You further explained to groups the reasons for and the purpose of the action.

*Responsive Statement*:

C/Wasson knocked on three doors and said to the Midshipmen within "Change clothes. We're going to throw the RC and RX in the Sound." No further words of encouragement were given to these men or were any orders given by C/Wasson at any time.

*Finding*:

Midshipman Wasson did foment discontent by knocking on doors, telling Midshipmen to change clothes and encouraging them to join the movement to Regimental Row. He did explain to other Midshipmen the reasons for the action.

4. *Specification*:

In spite of warnings by Midshipmen in authority not to bring underclassmen to Regimental Row, you did nothing to stop the movement of any Midshipmen.

*Responsive Statement*:

No Midshipman in authority warned c/Wasson not to bring underclassmen to Regimental Row. C/Ellard and C/Mazza who gave such warnings were in no position of authority at that time.

*Finding*:

Midshipman Wasson did in fact ignore the warning of a Midshipman in authority not to bring underclassmen to Regimental Row.

5. *Specification*:

In Regimental Row you defied the vested authority of the Regimental Commander and Regimental Executive Officer and carried on an argumentative discussion of a mutinous nature with the Regimental Commander and Regimental Executive Officer in the presence of other Midshipmen.

*Responsive Statement*:

Vested authority was not defied as the movement ceased when the Regimental Commander Ordered it to cease. The argumentative discussion was not of a mutinous nature as it was in response to the Regimental Commander's and Regimental Executive Officer's questions "What's going on here? What's the meaning of this?". C/Wasson and the other Second Classmen present were invited to remain and discuss the matter further at the Command Board meeting. C/Wasson chose not to remain as the purported statements were clarified during the argumentative discussion.

*Finding*:

Midshipman Wasson did in the presence of other Midshipmen, defy the authority of the Regimental Commander and carried on a loud and argumentative discussion with the Regimental Commander and Regimental Executive Officer.

6. *Specification*:

You did nothing to stop the actions of Midshipmen of the underclass who had physically manhandled the Regimental Executive Officer.

*Responsive Statement*:

The immediate scene of the manhandling was the Regimental Ward room. C/Wasson was not on the immediate scene when the manhandling commenced as he had gone to see if the Regimental Commander was in his room. As c/Wasson was returning to the scene of the immediate action, The Regimental Commander gave the order to cease which was obeyed by all hands present. The only possible way that c/Wasson could

have stopped the manhandling was to have been at the immediate scene of its occurrence.

*Finding*:

None.